519 S.E.2d 393

Robert Lewis CLAY

v.

COMMONWEALTH of Virginia.

Record No. 1893–97–2.

Court of Appeals of Virginia,
Richmond.

Oct. 5, 1999.

652

J. William Watson, Jr., Halifax (Watson & Nelson, P.C., on brief), for appellant.

Leah A. Darron, Assistant Attorney General (Mark L. Earley, Attorney General, on brief), for appellee.

Present: ELDER and LEMONS, JJ., and COLE, Senior Judge.

COLE, Senior Judge.

Robert Lewis Clay (appellant) was convicted in a jury trial of second degree murder and use of a firearm in the commission of murder. He contends the trial court erred by (1) refusing to allow him to cross-examine Thelma Burns and Carlos Ragland during the *voir dire* conducted outside the jury's presence, (2) allowing hearsay evidence from these two witnesses, and (3) refusing to allow him to call Deputy David Martin as a witness. We find no reversible error and, for the following reasons, affirm the convictions.

## Facts

On August 25, 1996, appellant entered the Halifax County Sheriff's Office and asked to speak to Lieutenant Ernest Powell. Appearing "shook-up" and "upset," appellant told Powell he had shot his wife, Joy Clay. Powell told the dispatcher to call the rescue squad. When the rescue squad arrived at appellant's home, they found Mrs. Clay's dead body on the den floor. Mrs. Clay had died from two gunshot wounds.

At trial, Thelma Burns testified outside the presence of the jury, and later before the jury, that she spoke with Mrs. Clay every other day. In the months prior to her death, Mrs. Clay asked Burns whether she could move boxes to Burns's home as she planned to move because she "was very scared of what her husband might do to her." During one telephone conversation, Burns overheard appellant say to Mrs. Clay, who had just attended a funeral, "I'm going to kill you bitch, you can't never go with me to any of my family's funerals and I'm tired of you, I'm going to kill you, bitch." During a telephone conversation only days before Mrs. Clay was killed, Burns overheard appellant say to Mrs. Clay, "[Y]ou might have got that school bus, but you won't drive that school bus." [1]

---

1. Although not entirely clear from the record, we deduce that Mrs. Clay had recently obtained a job as a school bus driver.

At trial, Carlos Ragland testified outside the presence of the jury, and subsequently told the jury, that Mrs. Clay told him about a month before her death that she was planning to move "because she was afraid of what might happen to her." During another telephone conversation, Ragland overheard appellant call Mrs. Clay a "B" and say that "he was going to kill her because he was tired of her."

Robert Lewis Clay, Jr., the only son of appellant and Mrs. Clay, testified that his mother told him in phone conversations during the month leading up to her death that "she was moving away and getting another job in Roxboro somewhere" because she "couldn't take it no more." Robert testified that appellant was an avid hunter who practiced "safe firearms." Robert never saw appellant load or unload a gun inside the house, and appellant taught him to keep the safety on until ready to shoot.

Appellant testified that when he confronted his wife about $5,000 missing from his gun cabinet, she first denied knowing anything about the money, but then admitted taking the money and refused to return it. Appellant "just got all upset" and took a gun from his gun cabinet. Appellant testified that he thought his wife would tell him where the money was if she saw the gun. Appellant claimed that when he "raised the gun up it just went off." Appellant claimed that the gun discharged twice, although he did not recall pulling the trigger.

## I. Cross–Examination during *Voir Dire*

■ Appellant contends the trial court erred by refusing to allow him to cross-examine Thelma Burns and Carlos Ragland during the *voir dire* conducted outside the presence of the jury. He claims that the Sixth and Fourteenth Amendments to the Constitution of the United States, and Article I, Section 8, of the Virginia Constitution give him the right to confront his accusers. Therefore, he contends the trial court erred in refusing to allow defense counsel to cross-examine Burns and Ragland during *voir dire* conducted outside the presence of the jury.

Although appellant objected when the trial judge refused to allow defense counsel to cross-examine Burns and Ragland on *voir dire* conducted out of the presence of the jury, he did not do so on constitutional grounds and did not specify any constitutional grounds. No ruling of the trial court will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice. *See* Rule 5A:18. The record does not reflect any reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.

Prior to the trial, defense counsel advised the trial court that he had ascertained that the Commonwealth might present certain witnesses to whom Mrs. Clay made statements before she died. He assumed they would be adverse. Defense counsel stated that "it would be appropriate to let Mr. Green-backer [Commonwealth's Attorney] ask them the questions that he's going to ask them and hear their responses so I can make the appropriate objections, because there's some indica-tion that she said she was going to leave or that he had been mean to her or something along those lines. . . ."

The Commonwealth's Attorney stated that he did not want to have a mini-trial but would "submit to the court or make a proffer." Defense counsel replied: "All I wanted to do was to see if I could hear what they were going to say before so I could object to it, preserve the record, make the appropriate objections, and then the jury can hear whatever you see fit." Both the trial judge and the Commonwealth's Attorney agreed to this procedure.

In due course, the Commonwealth called Thelma Burns as a witness. She submitted to what is called in the record a "Voir Dire Examination," out of the presence of the jury. Mr. Greenbacker first fully examined the witness. When he con-cluded, defense counsel commenced to cross-examine the wit-ness. The Commonwealth's Attorney objected, stating, "[I] think the proffer of the evidence without cross-examination is probably the appropriate way to go at this point." The trial

judge sustained the objection and refused to permit cross-examination until such time as the witness was called as a witness in the trial before the jury. After argument of counsel, the judge further held that the evidence was admissible. Upon this record, we find no abuse of the trial court's discretion. In the presence of the jury, defense counsel fully cross-examined both witnesses. The purpose of the *voir dire* was to permit defense counsel to hear the evidence prior to trial for the purpose of permitting him to "object to it, preserve the record, [and] make the appropriate objections," pursuant to his own request.

## II. Victim's Hearsay Testimony

Appellant contends the trial court erred in admitting in evidence the testimony of Thelma Burns and Carlos Ragland regarding statements made to them by the victim, Joy Clay, indicating that she was going to leave appellant because she was afraid of what he might do to her.[2] Burns testified that on numerous occasions before the death of Joy Clay, she had telephone conversations with her in which "she asked [her if she] could she bring some boxes to [her] house. [Clay] stated that she was going to move because she was very scared of what her husband might do to her." Burns testified she received like requests and intentions up to the time of Clay's death.

In similar phone conversations, Carlos Ragland testified the victim, Joy Clay, "told [him] she was planning on moving to Roxboro, North Carolina" and "she was going to move because she was afraid of what might happen to her." Appellant argued that the evidence that Joy Clay had to get out of the house because she was afraid of what he might do to her did not prove that he intended to kill her. Therefore, the evidence was not material, was highly prejudicial, and should not

---

**2.** Appellant does not challenge the admissibility of the statements made by the appellant to Joy Clay, and overheard by Thelma Burns and Carlos Ragland in a telephone conversation, to the effect that he was going to kill her. These statements are considered herein under another exception to the hearsay rule.

have been admitted in evidence. The Commonwealth maintained this evidence was admissible under the state of mind exception to the hearsay rule and was material to show appellant's motive and intent.

A person seeking to have hearsay declarations admitted must clearly show that they are within an exception to the rule. *See Doe v. Thomas,* 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984); *Foley v. Commonwealth,* 8 Va.App. 149, 161, 379 S.E.2d 915, 921, *aff'd en banc,* 9 Va.App. 175, 384 S.E.2d 813 (1989). Hearsay evidence is inadmissible at trial unless it falls into one of the recognized exceptions to the rule. *See Evans–Smith v. Commonwealth,* 5 Va.App. 188, 197, 361 S.E.2d 436, 441 (1987).

The Commonwealth argues that the testimony of Thelma Burns and Carlos Ragland relating Clay's statements of threats fall within the state of mind exception. While the statements tend to prove the state of mind of the victim, Joy Clay, such statements "are admissible in Virginia [only] when the statements are relevant and material." *Johnson v. Commonwealth,* 2 Va.App. 598, 602, 347 S.E.2d 163, 165 (1986); *see Kauffmann v. Commonwealth,* 8 Va.App. 400, 406, 382 S.E.2d 279, 282 (1989). Thus, the issue we must address is whether the evidence of the victim's state of mind is relevant and admissible evidence.

In *McCormick on Evidence,* the problem which arises in connection with the admissibility of accusatory statements made before the act by homicide victims is discussed:

The possibility of overpersuasion, the prejudicial character of the evidence, and the relative weakness and speculative nature of the inference, all argue against admissibility as a matter of relevance. Moreover, even if the judgment is made that evidence of fear standing alone should be admitted, statements of fear are rarely stated pristinely. Instead, that state of mind usually assumes the form either of a statement by the victim that the accused has made threats, from which fear may be inferred, or perhaps more likely a statement of fear because of the defendant's threats.

> ... [T]he cases have generally excluded the evidence.... Exclusion is not universal, however, for in some circumstances statements may be admissible under other hearsay exceptions, such as that for startled utterances or dying declarations.... There is broad agreement that such statements are admissible where the defense claims self-defense, suicide, or accidental death, because in each of those situations the decedent's fear helps to rebut aspects of the asserted defense.

*McCormick on Evidence* § 276 (John W. Strong, ed., V. 2, 4th ed. 1992) (footnotes omitted).

■ Admissibility of declarations under the state of mind exception are also conditional on three prerequisites:

1. The statement must refer to a presently existing state of mind. Although the mental state of emotion must exist at the time of the declaration, it may relate to matters occurring in the past or in the future.

2. There must be no obvious indication of falsification or contrivance.

3. The mental condition must be relevant to the case.

Charles E. Friend, *The Law of Evidence in Virginia* § 18–16 (4th ed. 1993).

■ In *Hanson v. Commonwealth,* 14 Va.App. 173, 416 S.E.2d 14 (1992), we stated:

> The state of mind of a homicide victim is relevant and material only in cases where the defense contends that the death was the result of suicide, accident, or self-defense. In those instances, the state of mind must have been communicated to the accused. When those defenses are not an issue, and when the accused has not been made aware of the victim's state of mind, the statement would become relevant only through "a circuitous series of inferences."

*Id.* at 188, 416 S.E.2d at 23 (citations omitted).

> For the state of mind of the victim to be relevant to prove the state of mind of the accused, some nexus must exist which inferentially implicates the accused, such as by show-

ing "previous threats made by the defendant towards the victim, narrations of past incidents of violence on the part of the defendant or general verbalizations of fear of the defendant."

*Id.* at 188–89, 416 S.E.2d at 23 (citation omitted).

 Appellant was charged with first degree murder and use of a firearm in the commission of murder. In homicide cases, the state of mind of the victim is not material but the state of mind of the accused is material to prove his or her motive and mental condition. *See Parsons v. Commonwealth,* 138 Va. 764, 777, 121 S.E. 68, 72–73 (1924). In a first degree murder case, the Commonwealth must prove that the defendant killed the victim, that the killing was malicious, and that the killing was willful, deliberate and premeditated. *See Painter v. Commonwealth,* 210 Va. 360, 364, 171 S.E.2d 166, 169–70 (1969).

In this case, appellant contends that the killing was accidental, but neither the appellant nor any witness testified that the victim's state of mind was communicated to appellant. On the contrary, all of the witnesses testified that the victim's statements, that she planned to move to North Carolina because she was afraid of her husband, were not communicated to the accused. Further, the record contains no evidence establishing a nexus or link that inferentially establishes that the accused had any knowledge of the statements made by his wife to Burns and Ragland. Without some nexus to prove that the statements were communicated to the accused or that he had knowledge of them either directly or inferentially, the statements were not material because the accused could not have acted upon them. The trial court erred in admitting this evidence.

 However, we must now determine whether the court's error was harmless.

The crux of the harmless error analysis is whether the defendant received a fair trial on the merits and substantial justice has been achieved. When an error at trial has affected the verdict, the defendant has been deprived of a

fair trial on the merits and substantial justice has not been achieved.

*Timmons v. Commonwealth,* 15 Va.App. 196, 199, 421 S.E.2d 894, 896 (1992); *see also Davies v. Commonwealth,* 15 Va.App. 350, 353, 423 S.E.2d 839, 840 (1992). Although the trial court erred by admitting improper evidence, "this does not automatically entitle . . . [the defendant] to a reversal of his conviction. 'A conviction should not be reversed unless the introduction of improper evidence suggests a manifest probability that it was prejudicial to the defendant.' " *Rider v. Commonwealth,* 8 Va.App. 595, 600, 383 S.E.2d 25, 27 (1989) (citations omitted); *see also Hall v. Commonwealth,* 12 Va.App. 198, 216, 403 S.E.2d 362, 373 (1991); *Mason v. Commonwealth,* 7 Va.App. 339, 348, 373 S.E.2d 603, 608 (1988).

 "The effect of an error on a verdict varies widely 'depending upon the circumstances of the case.' Each case must, therefore, be analyzed individually to determine if an error has affected the verdict." *Lavinder v. Commonwealth,* 12 Va.App. 1003, 1009, 407 S.E.2d 910, 913 (1991) (citation omitted). We have further said:

> "Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

*Sargent v. Commonwealth,* 5 Va.App. 143, 154, 360 S.E.2d 895, 901 (1987) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 674, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

We, therefore, look to the evidence to see if the improperly admitted statements by the victim had any effect upon the verdict of the jury and deprived the accused of a fair trial. The evidence overwhelmingly proved that appellant deliberately shot his wife. He admitted in a detailed, written state-

ment to Deputy David Martin that he shot his wife. In his written statement and in his testimony at trial, appellant stated that he discovered $5,000 missing from his gun cabinet. He went to the den where his wife was sitting on a sofa. He confronted her about the missing money and she denied knowing anything about it, but then admitted taking the money. She refused to return it. Appellant testified that he became upset. He went to the bedroom where his gun cabinet was located. He obtained one of his several guns. He did not look to see if it was loaded, and he did not load it. He then went back to the door of the den where his wife was seated. Appellant told her, "I needed the money," raised the gun up, and it went off. He did not remember discharging the gun and did not remember pulling the trigger. Appellant testified that he "thought if she seen the gun she might tell me where my money was at." He testified the gun went off twice.

To prove motive and intent of the accused, the Commonwealth produced the testimony of Thelma Burns and Carlos Ragland. During one telephone conversation between Burns and the victim, Burns overheard appellant in the background say to Joy Clay, who had just returned from attending a funeral, "I'm going to kill you bitch, you can't never go with me to any of my family's funerals and I'm tired of you, I'm going to kill, bitch." Ragland also testified that during a telephone conversation with Joy Clay, he heard the appellant in the background call his wife a "B" and say that "he was going to kill her because he was tired of her." This evidence was admissible as an exception to the hearsay rule when offered by the prosecution because it constituted the statement of an opposing party. The jury was entitled to consider it to prove appellant's motive and intent. *See Alatishe v. Commonwealth*, 12 Va.App. 376, 378, 404 S.E.2d 81, 82 (1991).

Appellant's son, Robert Lewis Clay, Jr., testified that he was the executor of his mother's estate and went through her papers and effects. He never found any cash as large as "a thousand dollars or two thousand dollars." He did not find that she had transferred any large sum of money to or from

any accounts. Appellant stated in his statement to Deputy Martin that he never found the $5,000. It can be reasonably inferred from this testimony that the $5,000 never existed.

Robert further testified that he grew up in the household with his parents and that his father was a hunter and hunted every hunting season. He testified that his father had "over three" firearms and that his father taught him how to hunt. Both always "practiced safe firearms." He never saw his father load or unload a gun in the house. His father always cleaned his guns regularly during the off-season. Robert had never known his father to keep a gun in his house that had shells chambered in it.

Appellant testified, "when I raised the gun up it just went off." He did not remember pulling the trigger. He stated, "I thought if she seen the gun she might tell me where my money was at."

James L. Pickleman, an employee at the Virginia Division of Forensic Science Laboratory in the firearms section, testified as an expert in firearms. He testified that if the gun was loaded, one would have to push the safety open and then pull the trigger to fire the gun. This would fire the shell that was in the chamber. The murder weapon was automatic loading. The action of firing the shell would eject the shell from the gun. When fired, the pellets would go out of the muzzle and the recoil action would push the bolt back and the next shell from the magazine would be loaded into the chamber. It would then be ready to fire again. The trigger would have to be pulled again to fire the second shot. Pickleman further testified that the trigger mechanism on the weapon would not fire easily. He stated that it would take three and three-quarters pounds of pressure to pull the trigger on each occasion. He further testified that the only way the gun could fire the second time would be for the trigger to be pulled by applying the necessary amount of pressure. Pickleman's testimony provided strong evidence that appellant did not accidentally fire the shotgun.

Dr. Glen Robert Groben, a medical examiner, testified that the victim received two shotgun wounds to the body. One wound was to the head and chest; the other was to the left side of the body. In his opinion, both wounds were lethal and the victim would have died in minutes from loss of blood.

We conclude that the admission of the statements of the victim, although erroneous because they were not communicated to the appellant, was harmless beyond a reasonable doubt in the light of all of the other evidence of the Commonwealth, and we find that it was harmless error to admit them into evidence.

### III. Refusal to Allow Martin to Testify

After the Commonwealth rested its case, appellant attempted to call Deputy David Martin as a witness on his behalf. The Commonwealth objected, contending that appellant's statements to Martin were inadmissible hearsay and that appellant was attempting to imply to the jury that evidence had been "improperly suppressed by the prosecution." The Commonwealth also contended that appellant was attempting to admit appellant's statements into the evidence through Martin when he did not intend to testify himself. Appellant asserted that the court should permit Martin to testify because he had observed appellant after the shooting and had taken written statements from him at the sheriff's office. Martin had no other participation in the case.

The trial court excluded the testimony of Martin, stating that "it's kind of setting up a straw man to knock it down or something."

Appellant proffered for the record the following summary of Martin's proposed testimony:

His name is David Martin. He was instructed to obtain a full statement from Mr. Clay if he was willing to give one. He indicated he would give one. He was read his standard Miranda rights. The statement is approximately four pages long in Martin's handwriting. About thirty minutes later, Martin returned and asked Clay some more questions.

During the thirty minute interim, Clay was in the presence of Martin, except maybe for a second or two. Clay's demeanor throughout the entire process was somber and quiet. Those two words best described Clay to Martin. Clay was cooperative.

Appellant was entitled to call witnesses in his defense, and we find no reason for the trial court to have excluded Martin as a witness. The Commonwealth was entitled to make appropriate objections to any improper questions. The court could then have ruled upon the specific objection and we would have a record to review.

Under the same principles previously stated in this opinion, we must determine whether the court's error was harmless.

Later in the trial, the appellant testified on his own behalf. He testified that he agreed to make a statement to Martin. Martin read him his rights before taking the statement; Martin told him anything he said could be used against him. Martin took his time and got everything right. Martin took one statement and later, came back and asked some additional questions. Appellant signed a paper waiving his rights and a statement consenting to a search of his house. Appellant told Martin he did not know the gun was loaded and felt terrible about what had happened. Appellant admitted the statement was given freely and voluntarily without threats of force or coercion of any kind from anyone. Later in the trial, the written statements were introduced into the evidence without objection.

Lieutenant Powell had previously testified that appellant arrived at the sheriff's department appearing "shook up or shaken" and upset. Appellant asked to speak privately with Powell and admitted killing his wife. Appellant gave his house key to Powell to make sure the law enforcement officers could enter the house. This evidence showed that appellant sought out the police to admit shooting his wife, that he was cooperative, and that he was visibly shaken and upset.

 Martin's testimony would have been corroborative of appellant's testimony but cumulative of Powell's testimony. "[C]orroborative testimony and cumulative testimony are not the same thing. Cumulative testimony is repetitive testimony that restates what has been said already and adds nothing to it. It is testimony of the same kind and character as that already given." *Massey v. Commonwealth*, 230 Va. 436, 442, 337 S.E.2d 754, 758 (1985). "[W]here evidence is merely cumulative its introduction may be limited by the court. Yet, because of the constitutional right to call for evidence in one's favor, even cumulative evidence should sometimes be admitted. Where testimony is material 'even though cumulative to some extent' it should nonetheless be considered." *Id.*

 Corroborative evidence is evidence that does not emanate from the defendant's mouth, does not rest wholly upon the defendant's credibility, but is evidence that adds to, strengthens, and confirms defendant's testimony. *See Massey*, 230 Va. at 442–43, 337 S.E.2d at 758; *see also Proctor v. Town of Colonial Beach*, 18 Va.App. 28, 441 S.E.2d 233 (1994); *Cash v. Commonwealth*, 5 Va.App. 506, 364 S.E.2d 769 (1988).

The trial court erred in excluding Martin's testimony; however, the error was harmless. The only difference between Martin's proffered testimony and that given by appellant and Lieutenant Powell is that during the time the statements were taken in the calm of the sheriff's office, Martin said appellant was somber and quiet and was cooperative. The fact that when appellant first appeared at the sheriff's office and appeared "shaken" and "upset" does not contradict Martin's testimony that appellant appeared "somber" and "quiet" when giving the statement. The difference is inconsequential. The evidence admitted at trial clearly proved that appellant was upset after he killed his wife and that he cooperated with the authorities. Martin's testimony would have added nothing to the evidence presented by the testimony of Powell and the appellant. Therefore, the error was harmless because it could not have affected the outcome of the case.

Accordingly, the trial court's judgment is affirmed.

*Affirmed.*

ELDER, Judge, concurring, in part, and dissenting, in part:

I concur in Part I of the majority opinion. However, I respectfully dissent from Parts II and III. Although I agree that the trial court erred in admitting the victim's hearsay statements to Thelma Burns and Carlos Ragland and in excluding the testimony of Deputy Martin, I disagree with the majority's conclusion that these errors were harmless.

We repeatedly have held as follows:

> In Virginia, non-constitutional error is harmless "[w]hen it *plainly appears* from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." Code § 8.01–678 (emphasis added). "[A] fair trial on the merits and substantial justice" are not achieved if an error at trial has affected the verdict. Consequently, under Code § 8.01–678, a criminal conviction must be reversed unless "it plainly appears from the record and the evidence given at the trial that" the error did not affect the verdict. *An error does not affect a verdict if a reviewing court can conclude, without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same.*

*Lavinder v. Commonwealth,* 12 Va.App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (*en banc*) (emphasis added). Where the error involves improperly admitted evidence, we hold the error harmless when that evidence is merely cumulative of other, properly admitted evidence. *See Freeman v. Commonwealth,* 223 Va. 301, 316, 288 S.E.2d 461, 469 (1982). Thus, "'[e]ven though testimony is objectionable as hearsay, its admission is harmless error when the content of the extrajudicial declaration is clearly established by other competent evidence.'" *West v. Commonwealth,* 12 Va.App. 906, 911, 407 S.E.2d 22, 25 (1991) (quoting *Schindel v. Commonwealth,* 219 Va. 814, 817, 252 S.E.2d 302, 304 (1979)). Conversely, the erroneous exclusion of evidence also may be harmless if the fact sought to be proved by that evidence is established by other, properly admitted evidence.

Here, I agree with the majority that the trial court erroneously admitted testimony regarding the victim's statements that she planned to move to North Carolina because she was afraid of what appellant might do to her. However, unlike the majority, I also would hold that the erroneous admission of these statements was not harmless. Although evidence properly admitted proved that appellant had threatened to kill his wife on one prior occasion, the admission of her statements that she was afraid of him gave added weight to his threat by providing evidence that she believed the threat. Evidence that the victim, as someone who presumably knew appellant well, believed the threat strengthened the probative value of the evidence of the threat itself and could have affected the jury's finding regarding appellant's state of mind at the time of the shooting. I would hold that the evidence that wife feared appellant was not cumulative of other properly admitted evidence. Therefore, I do not believe we may conclude, "without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same." *Lavinder*, 12 Va.App. at 1005, 407 S.E.2d at 911.

I also agree with the majority's holding that the trial court erroneously excluded Deputy Martin's testimony regarding appellant's demeanor and willingness to cooperate after the shooting. Again, however, I would hold that the erroneous exclusion of this evidence was not harmless. Martin's testimony as proffered by appellant was not merely cumulative of Lieutenant Powell's testimony. Powell's testimony, as observed by the majority, established that appellant sought out police to admit shooting his wife and that he was visibly shaken and upset. However, Powell's testimony—which, including cross-examination, spans only three pages in the appendix (four pages in the transcript)—indicates that Powell's contact with appellant was limited to the time of appellant's initial arrival at the police station. Once appellant told Powell he had shot his wife in their home and did not know whether she was still alive and gave Powell a key, Powell asked the dispatcher to call the rescue squad and "[got] somebody to sit

with [appellant] while [Powell] went out to [appellant's] house." Powell related no further contact with appellant. Martin's testimony would have established that appellant remained in Martin's company for more than "thirty minutes to an hour," during which time he continued to cooperate, did not invoke his right to silence or counsel, and gave a lengthy statement regarding the shooting while remaining somber and quiet.

Without hearing the erroneously excluded evidence, the jury convicted appellant of second degree murder, which required a finding that appellant acted with malice in shooting his wife. However, Deputy Martin's testimony concerning appellant's demeanor and continued cooperation lends support to appellant's testimony that the shooting was an accident which, if believed, would have supported appellant's conviction for the lesser offense of manslaughter. Although all the evidence, including Deputy Martin's testimony, supported appellant's conviction for second degree murder, I do not believe that we can conclude, without usurping the jury's fact finding function, that the error did not affect the verdict.

For these reasons, I respectfully dissent from Parts II and III of the majority's opinion, and I would reverse and remand for a new trial.