PRESENT: Carrico, C.J., Lacy, Hassell, Keenan, Koontz, and Kinser, JJ., and Stephenson, S.J.

ROBERT LEWIS CLAY

OPINION BY
v.  Record No. 002112    SENIOR JUSTICE ROSCOE B. STEPHENSON, JR.
June 8, 2001
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we determine whether the trial court committed reversible error in (1) allowing certain evidence under the state-of-mind exception to the hearsay rule and (2) excluding certain testimony of a deputy sheriff.

I

Robert Lewis Clay was indicted in the Circuit Court of Halifax County for the first-degree murder of his wife, Joy Clay, in violation of Code § 18.2-32, and for using a firearm in the commission of murder, in violation of Code § 18.2-53.1. A jury found Clay guilty of second-degree murder and fixed his punishment at 40 years' imprisonment. The jury also found Clay guilty of the firearm offense and fixed his punishment at imprisonment for three years, as prescribed by Code § 18.2-53.1. Following a sentencing hearing, the trial court sentenced Clay in accordance with the jury's verdict.

Clay appealed, and a panel of the Court of Appeals affirmed the convictions. Clay v. Commonwealth, 30 Va. App. 650, 519 S.E.2d 393 (1999). Thereafter, the Court of Appeals granted

Clay a rehearing en banc, and the full Court also affirmed Clay's convictions. Clay v. Commonwealth, 33 Va. App. 96, 531 S.E.2d 623 (2000). We awarded Clay this appeal.

II

On the morning of August 25, 1996, Clay went to the Halifax County Sheriff's Office and asked to speak with Deputy Sheriff Ernest Powell. Clay was visibly "shook up" and "upset." Powell asked Clay what was wrong, and Clay requested to speak with Powell in private. Clay then told Powell that he had shot his wife.

Clay also told Powell that he did not know whether his wife was still alive or whether his house was locked. Clay gave Powell the key to his house, and Powell directed the dispatcher to call the rescue squad. When members of the rescue squad arrived at Clay's home, they found Joy Clay's dead body on the den floor. Two telephone receivers in the house, one in the kitchen and one in the den, were off the hook.

An autopsy revealed that Joy Clay had sustained two shotgun wounds to her body. One wound was to her head and chest; the other was to her left arm and side. According to the medical examiner, both wounds were lethal, and the victim died in minutes from the loss of blood.

A Remington 12-gauge, number four buckshot shell and a Winchester 12-gauge, ought buckshot shell were found in the den.

2

Buckshot recovered from the victim's body was consistent with pellets that would have come from these shells. The police seized a Model 58 Remington Sportsman 12-gauge shotgun from a gun cabinet in the house.

A firearms expert testified that he test-fired the seized shotgun four times, and the weapon did not malfunction. He stated that three and three-quarters pounds of pressure was required to pull the trigger and fire the weapon. The expert also explained that the trigger had to be pulled and released in order for a second shell to enter the chamber and before the weapon could be fired a second time. A single pull of the trigger, therefore, would not cause the weapon to fire twice.

In July 1996, the month before Joy Clay's death, Thelma Burns, while talking on the telephone with Joy, overheard Clay call his wife a bitch and say to her, "I'm tired of you, I'm going to kill you." Burns' son, Carlos Ragland, heard the same statement by Clay as he was listening on another telephone in his mother's house. Three days before Joy's death, while Burns and Joy were having another telephone conversation, Burns heard Clay say, referring to a job Joy had secured as a school bus driver, "[Y]ou might have got that school bus, but you won't drive that school bus."

Clay's son, Robert Lewis Clay, Jr., testified that his father was an avid hunter and had taught him to practice firearm

safety. The son never had seen his father load or unload a gun in the house, and Clay had advised his son to keep a firearm's safety engaged until the gun was ready to be fired.

Clay testified that, prior to the shooting, he discovered that $5,000 in cash was missing from his gun cabinet. He went into the den where his wife was seated on a sofa and confronted her about the missing money. Clay's wife first denied any knowledge of the money, but she later admitted taking the money and refused to return it. Clay stated that he "just got all upset" and retrieved a gun from the gun cabinet. He did not look to see if the gun was loaded, and he did not load it. Clay told his wife that he "needed the money," and he thought she would tell him where the money was upon seeing the gun. Clay claimed that, "when [he] raised the gun up[,] it just went off." He said the gun had discharged twice, but he did not recall having pulled the trigger.

### III

At trial, Burns and Ragland were allowed to testify, over Clay's objection, that, in the months prior to Joy's death, she had told them that she planned to move because she was afraid of what Clay might do to her. Clay contended then, as he does on appeal, that the testimony was inadmissible hearsay. The Court of Appeals ruled that the testimony was admissible under the state-of-mind exception to the hearsay rule, reasoning that

4

Joy's state of mind was relevant and material to show Clay's motive and intent in order to counter his assertion that the killing was accidental. Clay, 33 Va. App. at 107, 531 S.E.2d at 628.

Clay was charged with first-degree murder. Therefore, the Commonwealth had the burden of proving that he killed his wife and that the killing was willful, deliberate, and premeditated. See Stokes v. Warden, 226 Va. 111, 117, 306 S.E.2d 882, 885 (1983).

Generally, statements made by a crime victim that show the victim's state of mind are admissible as an exception to the hearsay rule, provided the statements are relevant and probative of some material issue in the case. Karnes v. Commonwealth, 125 Va. 758, 764-65, 99 S.E. 562, 564-65 (1919); see Compton v. Commonwealth, 219 Va. 716, 729, 250 S.E.2d 749, 757 (1979). Evidence is relevant if it tends to prove or disprove, or is pertinent to, matters in issue. Boggs v. Commonwealth, 199 Va. 478, 486, 100 S.E.2d 766, 772 (1957).

While it is difficult to reconcile the conflicting cases as to when a victim's statements are relevant, much must be left to the trial court's discretion. Karnes, 125 Va. at 764, 99 S.E. at 564. There seems to be substantial agreement, however, that a victim's statements regarding fear of the accused are admissible to rebut claims by the defense of self-defense,

5

suicide, or accidental death.  See, e.g., United States v.

Brown, 490 F.2d 758, 767 (D.C. Cir. 1973); John W. Strong, 2

McCormick on Evidence § 276 (5th ed. 1999).

When Joy's state of mind regarding her fear of Clay is

viewed in the light of the other facts and circumstances of the

case, we cannot say that the trial court abused its discretion

in admitting evidence of her statement.  Clay placed his intent

at issue, claiming Joy's death was accidental.  Thus, Joy's

expressed fear of Clay, coupled with his threats to kill her,

was relevant and probative of a material issue in the case;

i.e., whether the killing was willful and deliberate.

IV

Next, we consider whether the trial court erred in

excluding certain testimony of Deputy Sheriff David Martin.

Clay proffered Martin's testimony by calling him to the stand

and interrogating him in the absence of the jury.  The proposed

testimony can be summarized as follows:

> His name is David Martin.  He was instructed to obtain
> a full statement from Mr. Clay if he was willing to
> give one.  He indicated he would give one.  He was
> read his standard Miranda rights.  The statement is
> approximately four pages long in Martin's handwriting.
> About thirty minutes later, Martin returned and asked
> Clay some more questions. During the thirty minute
> interim, Clay was in the presence of Martin, except
> maybe for a second or two.  Clay's demeanor throughout
> the entire process was somber and quiet.  Those two
> words best described Clay to Martin.  Clay was
> cooperative.

6

Deputy Sheriff Ernest Powell previously had testified that Clay came to the sheriff's office, appearing "shook up" and "upset," and told Powell that he had shot his wife. Clay gave his house key to Powell so law enforcement officers and members of the rescue squad could enter the house.

Clay later testified on his own behalf. Clay testified that he had told Martin that he did not know the gun was loaded and that he felt terrible about what had happened.

The Court of Appeals concluded that Martin's testimony "would have been corroborative of Clay's testimony but cumulative of Powell's testimony." Clay, 33 Va. App. at 109, 531 S.E.2d at 629.* The Court held, therefore, that the trial court erred in excluding Martin as a witness because Clay "was entitled to call witnesses in his defense, and Martin's testimony, subject to appropriate objections by the [Commonwealth], was admissible." Id. at 110, 531 S.E.2d at 630. We will assume, without deciding, that the exclusion of Martin's testimony was erroneous because we agree with the Court of Appeals' finding that any error was harmless.

---

* At the time Martin's testimony was offered, Clay had not testified, and, therefore, the trial court could not have known whether Martin's testimony would be corroborative of Clay's testimony. After Clay's testimony, Clay did not recall Martin to testify.

When a federal constitutional error is involved, a reviewing court must reverse the judgment unless it determines that the error is harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967); Pitt v. Commonwealth, 260 Va. 692, 695, 539 S.E.2d 77, 78 (2000), cert. denied, ___ U.S. ___, 121 S.Ct. 1616 (2001). We have not decided, however, what standard applies where, as here, a federal constitutional error is not involved.

In determining that standard, which is a matter of state law, we are guided by Virginia's harmless-error statute, Code § 8.01-678. That statute provides, in pertinent part, as follows:

> When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any . . . defect, imperfection, or omission in the record, or for any other error committed on the trial.

We have applied Code § 8.01-678 in criminal as well as civil cases. See, e.g., Greenway v. Commonwealth, 254 Va. 147, 154, 487 S.E.2d 224, 228 (1997). In a criminal case, it is implicit that, in order to determine whether there has been "a fair trial on the merits" and whether "substantial justice has been reached," a reviewing court must decide whether the alleged error substantially influenced the jury. If it did not, the error is harmless.

In *Kotteakos v. United States*, 328 U.S. 750 (1946), the Supreme Court adopted the standard to be applied in determining whether nonconstitutional error is harmless under the federal "harmless error statute," 28 U.S.C. § 2111 (1994) (formerly 28 U.S.C. § 391). *Id.* at 757-58. That statute, which is similar in substance to Code § 8.01-678, provides that a reviewing court "shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

The test for nonconstitutional harmless error adopted in *Kotteakos* is as follows:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. . . . If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.* at 764-65 (citation omitted).

We adopt the *Kotteakos* harmless-error test and will apply the test in the present case in the light of Code § 8.01-678. The evidence showed that Clay discovered that $5,000 was missing from his gun cabinet and confronted his wife about the money. When Clay's wife admitted taking but refused to return the

9

money, Clay became upset.  Clay went to his gun cabinet, obtained a 12-gauge shotgun, returned to the den, and told his wife that he "needed the money."  Clay then raised the gun without determining whether it was loaded.  The gun fired twice.

In the month before the shooting, Burns and Ragland heard Clay threaten to kill his wife.  Clay's wife had also expressed to Burns and Ragland that she feared her husband.

The firearms expert testified that a person intending to fire the gun, had it been loaded, would have had to disengage the safety and pull the trigger.  This would have caused the shell in the chamber to fire, the empty shell to eject from the gun, and the next shell to load into the chamber from the magazine.  The gun then could be fired again, but the trigger would have to be pulled for the gun to fire a second time.  The expert further testified that the gun could not be fired easily; indeed, it would take three and three-quarters pounds of pressure to pull the trigger.  Finally, the expert testified that he had test-fired the weapon four times and that it did not malfunction.

Applying the Kotteakos harmless-error test in the light of Code § 8.01-678, we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole," that it plainly appears that Clay has had a fair trial and the verdict and the judgment were not

10

substantially affected by the exclusion of Martin's testimony. We conclude that the evidence, especially that of the firearms expert, overwhelmingly proved that the gun was not fired accidentally.  Therefore, we hold that any error in this case is harmless.

Accordingly, we will affirm the judgment of the Court of Appeals.

<u>Affirmed</u>.