COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges Huff, Athey and Fulton
Argued by videoconference


JOHN WALLACE BLANCHARD
                                                    MEMORANDUM OPINION* BY
v.        Record No. 1504-22-3                     JUDGE JUNIUS P. FULTON, III
                                                        DECEMBER 5, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
David B. Carson, Judge

John S. Edwards (Edwards Law Firm, on briefs), for appellant.

Jason D. Reed, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court for the City of Roanoke convicted John Wallace

Blanchard of taking indecent liberties with a minor, in violation of Code § 18.2-370.  On appeal,

Blanchard contends that the trial court erred in: (1) allowing the complaining witness to testify to

events that occurred outside the scope of the indictment, (2) admitting evidence outside the scope of

the indictment that caused a fatal variance between the charge and the evidence, (3) admitting text

messages the complaining witness sent to her mother over Facebook Messenger, (4) admitting prior

consistent statements made by the complaining witness, (5) admitting uncharged "bad acts"

evidence, and (6) failing to answer a jury question regarding jury instructions.  For the following

reasons we disagree with Blanchard and affirm the trial court.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party [below]." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). This standard requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn" therefrom. *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)).

In March 2021, R.B. was 17 years old and lived in Roanoke with her father, Blanchard, her stepmother, known by the nickname Blue, and her siblings. R.B.'s mother lived in Washington State. Blanchard and Blue were "very authoritative" parents, and R.B. often felt unwelcome in the family home. During her senior year, R.B. attended school remotely, which led to an improvement in her academics. She was therefore allowed to stay up later than her usual 8:00 p.m. bedtime, and she secured a part-time job at an area restaurant. She also began to spend more time with Blanchard and felt that their relationship was improving. One night after working all day, R.B. asked Blanchard for a massage because her shoulders hurt. R.B. sat in front of Blanchard on the living room couch and leaned back against his chest as Blanchard began to massage her down the base of her neck, shoulders, and back. Blanchard then slid his hands through the neck of her shirt, went underneath the cup of her bra, and touched her bare breast. Blanchard did not say anything as he massaged and pinched her nipples, and, out of fear, R.B. remained silent. R.B. later posted a video on TikTok explaining that Blanchard touched her "boobs" after she asked for a back rub.

Blanchard touched R.B. in a similar manner several additional times while she was still 17 and living at home. On one occasion, Blanchard whispered in her ear, asking if what he was doing was okay. When R.B. shook her head no, he re-adjusted her bra, straightened her shirt, and

- 2 -

apologized. During another incident, Blanchard approached R.B. from behind as she stood at her desk and put his hand under her shirt to touch her chest. R.B. could feel his erect penis pressed against her buttocks through their clothes. On another occasion, Blanchard's hand travelled down to R.B.'s waistband, but she put her arm across the waistband to stop him from going further.

Shortly after R.B. turned 18 and graduated from high school, Blanchard again massaged her back, unclasped her bra, and massaged the sides of her chest. On that occasion, R.B. was lying face down on her bed. Finally, on August 14, 2021 (the "kitchen incident"), R.B. was doing dishes when Blanchard entered the kitchen and approached her from behind. He thanked her for doing the dishes and then started to rub her chest with his hands underneath her sports bra. R.B. felt Blanchard's erect penis between her legs. R.B. was scared because Blanchard's behavior was escalating and she "didn't know how far he would try to push it." That night, R.B. texted her mother and a boyfriend asking for advice about what to do. She moved out of the house the next day. Blanchard then left R.B. a voicemail message, stating,

> Hey, [R.B.], its dad, I am just calling to say I'm sorry to make amends for what, for breaking your trust and I want you to know that when you are ready I would like to apologize in person. I know that may be a while but I am sorry I hurt you. I love you.

Blanchard also sent a text message saying, "I called to make amends and tell you I am sorry. I understand I have broken your trust it was never my intention."

Before trial, Blanchard filed motions seeking to exclude R.B.'s testimony regarding the kitchen incident, the text messages she sent to her mother following that incident, and the voicemail message Blanchard left on August 15. The trial court took the motions under advisement and stated that it would consider the admissibility of the evidence at trial. The trial court specifically stated that it would hear R.B.'s testimony concerning the kitchen incident separately before her expected testimony before the jury, but explained that it was inclined to admit the evidence. At trial, when R.B. started to testify about the kitchen incident, Blanchard renewed his objection to the testimony

- 3 -

and argued that the evidence was outside the indictment and occurred after R.B. turned 18. Instead of hearing R.B.'s testimony separately as the trial court previously indicated, the trial court overruled the objection and allowed R.B. to testify about the erection she felt during the kitchen incident.

R.B.'s mother, Heather Krona, verified that she and R.B. exchanged texts in which R.B. disclosed that Blanchard had been touching her inappropriately "for a while." Krona testified that R.B. specifically said that Blanchard "had been touching her breasts" and that his behavior "had escalated." Blanchard objected to this line of testimony, arguing that "while [R.B.'s] complaint itself certainly can be admitted," the "details describing the events" themselves were inadmissible. The trial court allowed Krona to testify to the "recent complaint" and gave "a little latitude in terms of context but to the extent it gets into significant details," sustained the objection. Without any further objection, Krona testified that R.B. said Blanchard "had pinned her against a counter top with a full erection, pressed into her back." On cross-examination, Blanchard inquired about a statement Krona made on one of the pages of the texts that suggested Blanchard was just testing how sexually experienced R.B. had become. Following Krona's testimony, the Commonwealth moved to admit four pages of text messages which included details of the alleged offense. Blanchard objected to the trial court's admission of the text messages and argued that it was merely the Commonwealth's attempt to "get more context in." The trial court ruled that since Blanchard asked about Krona's statements, the rest of the text messages were admissible for context.[1]

Karen Blanchard, R.B.'s distant cousin by marriage, testified that she never observed any affectionate behavior or a "loving, nurturing parenting style" between Blanchard and R.B. In August 2021, R.B. contacted Karen, clearly upset. Karen immediately drove to R.B.'s work

---

[1] The Commonwealth's exhibit did not include the page from the text messages that Blanchard had inquired about.

- 4 -

location and noticed that R.B. was "physically upset," puffy and teary-eyed. R.B. wrote about what happened on a tablet and showed it to Karen. Karen testified that the note said that Blanchard had been physically touching her inappropriately on more than one occasion and that she had an incident the night before where she felt extremely unsafe and "she didn't know what to do or where to go." Karen told R.B. that she could not return home and offered to let R.B. stay with her.

Roanoke Police Officer Devin Moore Irwin ("Officer Irwin") responded to R.B.'s allegation of sexual assault. Over Blanchard's objection, Officer Irwin testified that R.B. said Blanchard had "ran his hands over her breasts without a bra on" in March 2021 and that he repeated similar actions "around ten times" before coming up behind her in August 2021 and pushing an erection up against her while touching her breasts. Officer Irwin admitted that R.B. did not wish to press formal charges and that she did not seek a protective order. Rather, R.B. called the police for assistance in retrieving her personal property from Blanchard's house.

After the Commonwealth rested its case, Blanchard moved to strike the evidence, arguing that it failed to prove the requisite "lascivious intent" element of the offense. The trial court denied the motion to strike.

Blue testified for the defense. Blue acknowledged that she and Blanchard had a "very defined [parenting] structure" and "high standards for personal accountability and self respect and academic commitment." Blue recalled being summoned to Karen's house and given an iPad on which R.B. had written about the alleged assaultive behaviors. Blue read several lines and then became "so overwhelmed with disbelief that [she] had to set it down." Blue asked R.B., "do you just want to move out," and R.B. answered, "well yeah." Blue and R.B. had been discussing R.B.'s future and whether R.B. could move out and start her own life. Blue did not notice any change in R.B.'s behavior between March and August 2021, except that R.B. seemed to have "developed a relationship with [Blanchard]." After the meeting at Karen's, Blue returned home to speak with

Blanchard. Blanchard admitted to giving R.B. back rubs, but he denied touching her breasts or removing her bra. At trial, Blanchard objected to the admission of the note R.B. wrote on the iPad in its entirety because Blue only read the first few lines of it. He argued that the rest of the note was a prior consistent statement used merely to bolster R.B.'s testimony. The trial court sustained Blanchard's objection.

Blanchard testified that he gave R.B. a number of back rubs during her senior year in high school, but only upon her request. He admitted that during two separate back massages his hands accidentally brushed R.B.'s breasts. He also admitted to standing behind R.B. in the kitchen while she was doing dishes. However, he denied unclasping R.B's bra on any occasion and he denied ever feeling or exhibiting any sexual arousal around R.B.

Following the presentation of all the evidence, Blanchard renewed his motion to strike and additionally argued that the testimony pertaining to the kitchen incident was irrelevant, as it was outside the scope of the indictment and occurred after R.B. turned 18. The trial court denied the motion. The trial court then instructed the jury and, following closing arguments, released it for deliberations. During jury deliberations, the jury inquired of the court: "[w]hat do we do if we agree he committed the crime but we don't see evidence of intent?" The trial court responded, "I cannot answer the question as phrased. The elements of the alleged offense are set forth in the jury instructions, and it is for the jury to determine if the Commonwealth has carried its burden of proving all the elements by evidence beyond a reasonable doubt." Then, on the record, outside the presence of the jury, the trial court explained: "there was a single question from the jury. I reviewed it with counsel. I prepared a response, sent that question with the court's response back to the jurors. A copy of that question and the answer have been made a part of the file." The record does not reflect that Blanchard ever objected to the trial court's response prior to his motion to set aside the verdict. The jury convicted Blanchard of taking indecent liberties with a minor.

Blanchard filed a written motion to set aside the verdict, and the trial court held a hearing on the motion before sentencing. The trial court denied the motion to set aside the verdict and sentenced him to three years in prison, all suspended except the time he served in jail awaiting sentencing. Blanchard noted this appeal.

ANALYSIS

Blanchard's first five assignments of error address two separate evidentiary rulings made by the trial court; specifically, (1) that the trial court allowed R.B. to testify about the kitchen incident, which occurred after she turned 18, and (2) that the trial court admitted a portion of the text messages R.B. sent to her mother following the kitchen incident. For the following reasons, we affirm the evidentiary rulings made by the court below.

Standard of Review

"Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)). "This bell-shaped curve of reasonability" guiding appellate review "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). A reviewing court can conclude that "an abuse of discretion has occurred" only when "reasonable jurists could not differ" about the correct result. *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

Generally, absent other constraints, evidence is admissible as long as it is relevant. Va. R. Evid. 2:402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence."

- 7 -

Va. R. Evid. 2:401.  "The scope of relevant evidence in Virginia is quite broad." *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016).  In order to be admissible as relevant, "evidence [must] tend[ ] to prove a matter that is properly at issue in the case." *Id.* at 635 (alterations in original) (quoting *Brugh v. Jones*, 265 Va. 136, 139 (2003)).

I.

Admissibility of R.B.'s Testimony About the Kitchen Incident

Blanchard asserts that the trial court erred in allowing R.B. to testify about the kitchen incident for three reasons: (1) the testimony gave rise to a fatal variance between the indictment and the proof offered at trial, (2) the testimony was impermissible "uncharged bad acts" evidence, and (3) the court disregarded its own ruling on Blanchard's motion *in limine*.  Disagreeing with these contentions, we affirm the trial court's decision.

A.  Fatal Variance

"An indictment is a written accusation of a crime and is intended to inform the accused of the nature and cause of the accusation against him." *Scott v. Commonwealth*, 49 Va. App. 68, 73 (2006) (quoting *Hairston v. Commonwealth*, 2 Va. App. 211, 213 (1986)).  "The point of an indictment 'is to give an accused notice of the nature and character of the accusations against him in order that he can adequately prepare to defend against his accuser.'" *Purvy v. Commonwealth*, 59 Va. App. 260, 265-66 (2011) (quoting *King v. Commonwealth*, 40 Va. App. 193, 198 (2003)).  Thus, "[t]he accused cannot be convicted unless the evidence brings him within the offense charged in his indictment. . . . [T]he indictment must charge *the very offense* for which a conviction is asked." *Scott*, 49 Va. App. at 73 (second and third alterations in original) (quoting *Williams v. Commonwealth*, 8 Va. App. 336, 341 (1989)).  "A conviction for a crime other than the one charged in the indictment is plainly reversible." *Commonwealth v. Bass*, 292 Va. 19, 28 (2016).

While it is true that "[a] fatal variance occurs when the criminal pleadings charge one offense and the evidence proves another," *id.* at 27, a variance is only fatal "when the proof is different [from] and irrelevant to the crime defined in the indictment and is, therefore, insufficient to prove the commission of the crime charged," *Scott*, 49 Va. App. at 73 (alteration in original) (quoting *Griffin v. Commonwealth*, 13 Va. App. 409, 411 (1991)). That is, "[n]ot every variance is fatal. A 'non-fatal' variance is one that does not undermine the integrity of the trial and, thus, does not warrant a reversal on appeal." *Purvy*, 59 Va. App. at 266.

In this case, there does not exist any variance, much less a fatal one, between the indictment and the proof obtained at trial. Blanchard was charged with one felony count of taking indecent liberties with a minor in violation of Code § 18.2-370.[2] The indictment included the specific statute under which he was charged, the initials of the alleged victim, her age at the time of the offense, and the assertion that Blanchard "did unlawfully and feloniously knowingly and intentionally with lascivious intent, commit a violation of either this section or clause (v) or (vi) of subsection A of 18.2-370.1."[3] At trial, R.B. testified that when she was still 17 years old, Blanchard repeatedly put his hands underneath her bra and fondled her breasts. R.B. also testified that on one occasion while she was still 17, Blanchard stood behind her and she felt his erection. In the text message she sent

---

[2] "Any parent . . . who commits a violation of either this section or clause (v) or (vi) of subsection A of § 18.2-370.1 (i) upon his child . . . who is at least 15 but less than 18 years of age is guilty of a Class 5 felony." Code § 18.2-370(D).

[3] Any person 18 years of age or older who, . . . maintains a custodial or supervisory relationship over a child under the age of 18 and is not legally married to such child and such child is not emancipated who, with lascivious intent, knowingly and intentionally . . . (vi) sexually abuses the child as defined in subdivision 6 of § 18.2-67.10 is guilty of a Class 6 felony.

Code § 18.2-370.1. "'Sexual abuse'" means an act committed with the intent to sexually molest, arouse, or gratify any person, where: a. The accused intentionally touches the complaining witness's intimate parts or material directly covering such intimate parts." Code § 18.2-67.10(6)(a).

- 9 -

to her mother after the kitchen incident, she again mentioned that earlier incident. Thus, the evidence at trial proved Blanchard was convicted of the same offense for which he was indicted, upon proof that he committed that particular offense. The evidence related to the kitchen incident was not the *actus reus* for the conviction; it was simply relevant evidence that was probative in proving that conviction. There was no variance between the indictment and the evidence. The mere fact that Blanchard also committed a misdemeanor offense against R.B. after she turned 18 does not alter the fact that he committed the felony upon her when she was 17.

### B. Uncharged Bad Acts

Blanchard also alleges that in allowing R.B. to testify about the kitchen incident, which occurred after she turned 18, the trial court admitted impermissible "bad acts" evidence. We disagree.

Generally, "evidence which shows or tends to show that the accused is guilty of other crimes and offenses at other times, even though they are of the same nature as the one charged in the indictment, is not admissible to show the accused's commission of the particular crime charged." *Ortiz v. Commonwealth*, 276 Va. 705, 714 (2008). However, this general rule "must sometimes yield to society's interest in the truth-finding process, and numerous exceptions allow evidence of prior misconduct whenever the legitimate probative value outweighs the incidental prejudice to the accused." *Conley v. Commonwealth*, 74 Va. App. 658, 670 (2022) (quoting *Gonzales v. Commonwealth*, 45 Va. App. 375, 381 (2005)). Specifically, as our Supreme Court recently reaffirmed:

> other crimes evidence is admissible when it "shows the conduct or attitude of the accused toward his victim[;] establishes the relationship between the parties[;] or negates the possibility of accident or mistake[;]" or shows motive, method, intent, plan or scheme, or any other relevant element of the offense on trial.

*Kenner v. Commonwealth*, 299 Va. 414, 424 (2021) (alterations in original) (quoting *Ortiz*, 276 Va. at 714).

Moreover, in cases involving incest, it is well-established that

> evidence of acts of incestuous intercourse between the parties other than those charged in the indictment or information, whether prior or subsequent thereto, is, if not too remote in point of time, admissible for the purpose of throwing light upon the relations of the parties and the incestuous disposition of the defendant toward the other party, and to corroborate the proof of the act relied upon for conviction.

*Moore v. Commonwealth*, 222 Va. 72, 77 (1981) (quoting *Brown v. Commonwealth*, 208 Va. 512, 516-17 (1968)).

"Once the Court has determined that the 'prior bad acts' evidence is relevant, and not mere 'propensity evidence,' the Court must still determine whether the risk of unfair prejudice outweighs the probative value of the evidence." *Conley*, 74 Va. App. at 671. "Relevant evidence may be excluded if . . . the probative value of the evidence is substantially outweighed by (i) the danger of unfair prejudice, or (ii) its likelihood of confusing or misleading the trier of fact." Va. R. Evid. 2:403. "Rule 2:403's requirement that only *unfair* prejudice may be considered as grounds for non-admission 'reflects the fact that all probative direct evidence generally has a prejudicial effect to the opposing party.'" *Fields v. Commonwealth*, 73 Va. App. 652, 673 (2021) (quoting *Lee v. Spoden*, 290 Va. 235, 251 (2015)). "'[U]nfair prejudice' refers to the tendency of some proof to inflame the passions of the trier of fact, or to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Lee*, 290 Va. at 251. In fact, "[a]ll evidence tending to prove guilt is prejudicial to an accused, but the mere fact that such evidence is powerful because it accurately depicts the gravity and atrociousness of the crime or the callous nature of the defendant does not thereby render it inadmissible." *Fields*, 73 Va. App. at 672-73 (quoting *Powell v. Commonwealth*, 267 Va. 107, 141 (2004)). "The responsibility for balancing the

- 11 -

probative value versus the prejudicial effect rests in the sound discretion of the trial court." *Kenner*, 299 Va. at 424.

In this case, the Commonwealth was required to prove that Blanchard touched R.B. "with lascivious intent." Code § 18.2-370. R.B. testified that while she was still 17 years old, Blanchard began to touch and fondle her breasts and, on at least one occasion, attempted to put his hands in her pants. She became concerned enough after the kitchen incident to move out of the house, as she perceived that his behavior was escalating and she did not know how far he would go. There is no dispute that Blanchard touched R.B.'s breasts during the back massages. He simply claims that any touching was accidental, rather than lascivious. Thus, evidence that he developed an erection while standing behind R.B. and fondling her breasts during the kitchen incident was admissible and relevant to prove that he did so with lascivious intent and it supported the Commonwealth's contention that his prior acts of touching were inspired by the same purpose. *Moore*, 222 Va. at 77.

"[T]he Commonwealth is required to prove every element of its case." *Kenner*, 299 Va. at 426. "It is entitled to do so by presenting relevant evidence in support of the offense charged. The Commonwealth cannot have its evidence barred or 'sanitized' simply because the defendant takes the position that the offense did not occur and therefore intent is not genuinely in dispute." *Id.* Here, the evidence of what occurred in the kitchen after R.B. turned 18 was relevant to show Blanchard's conduct or attitude towards R.B., along with his motive, method, and intent. We find no error in the trial court's decision to allow R.B. to testify about the incident in the kitchen.

### C. Motion *in Limine*

Blanchard complains that the trial court changed its ruling on the motion *in limine*. However, the fact that the trial court did not follow the evidentiary ruling it made after the hearing on the *limine* motion is of no moment. "Trial judges are required to rule on issues as they develop at trial." *Zook v. Commonwealth*, 31 Va. App. 560, 569 (2000) (quoting *Bottoms v.*

*Commonwealth*, 22 Va. App. 378, 383 (1996)). "A trial court is empowered to change a legal determination as long as it retains jurisdiction over the proceedings before it." *Id.* (quoting *Bottoms*, 22 Va. App. at 384). Further, in this case, the trial court did not rule on the motion before trial as Blanchard argues, but instead reserved ruling and said that it would hear R.B.'s testimony about the kitchen incident before deciding on its admissibility at trial. When taking the motion under advisement, the trial court indicated that it was inclined to admit the evidence. At trial, R.B. testified at length about the offenses that occurred while she was 17, including an instance where Blanchard had an erection, and the trial court was aware of the nature of her expected testimony about the incident that occurred in the kitchen after she turned 18. Thus, its decision to allow her to testify without further prodding by the parties was not error.

For these reasons, we hold that the trial court did not err in allowing R.B. to testify about the kitchen incident.

II.

Admissibility of Text Messages R.B. Sent to Her Mother on August 14, 2021

Blanchard next asserts that the trial court erred in admitting a portion of the text messages R.B. sent to her mother following the kitchen incident. Blanchard argues that the text messages were inadmissible hearsay because the details included in the messages were not admissible under the "recent complaint" exception to the hearsay rule, that the messages contained "[h]earsay [w]ithin [h]earsay," and that the messages were not admissible as prior consistent statements to rehabilitate R.B. Assuming without deciding that the trial court erred in admitting the text messages into evidence, any error was harmless.

Blanchard did not object to the text messages as containing "[h]earsay [w]ithin [h]earsay." The parties expressly stipulated that the Facebook Messenger conversations between R.B. and Krona from August 14, 2021, were "fair and accurate representations of those conversations and are

- 13 -

authenticated." Moreover, Blanchard did not object to the admission of the messages on the specific "[h]earsay [w]ithin [h]earsay" basis when the Commonwealth sought to admit them. Thus, Blanchard's "[h]earsay [w]ithin [h]earsay" assertion is waived under Rule 5A:18 and we do not consider it. "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling." Rule 5A:18. Although Blanchard included this assertion in his post-trial motion to set aside the verdict, the objection came too late. The text messages were already admitted, and the jury had already considered them. Thus, because Blanchard did not timely object to the admission of the text messages at trial on the specific grounds he now alleges on appeal, we will not further address that specific assertion here.

Blanchard also argues that the text messages from R.B. to Krona were not admissible under any exception to the hearsay rule and claims that they were more prejudicial than probative and confusing to the jury. While we agree that the messages were not admissible under the "recent complaint" exception to the hearsay rule or as prior consistent statements for purposes of rehabilitation, we note that the trial court did not admit the messages for either of those reasons, and, in fact, the Commonwealth did not proffer the evidence on that basis. At trial, there was no discussion about "prior consistent statements" as applied to the admission of these messages from R.B. to Krona and the trial court sustained Blanchard's objection to any testimony concerning the details contained within them. Specifically, the trial court sustained Blanchard's objection to Krona's testimony "to the extent it gets into significant details" and only allowed the Commonwealth "a little bit of latitude" in eliciting Krona's testimony about R.B.'s complaint. We note, however, that Blanchard agreed at trial that the fact of R.B.'s subsequent complaint, itself, could be received as evidence.

On cross-examination, Blanchard elicited testimony from Krona regarding certain statements she made, herself, in response to R.B.'s complaint over Facebook Messenger. Then, on

re-direct examination, the Commonwealth sought to introduce the details of R.B.'s complaint, not to bolster her credibility as a witness or corroborate her story, but to give context to Krona's testimony on cross-examination concerning her initial odd response to R.B. in which she suggested that Blanchard was merely testing "how sexually experienced" R.B. had become. This line of questioning during the cross-examination pointed to a potentially non-criminal rationale for Blanchard's behavior. The Commonwealth thereafter sought to introduce the surrounding context of Krona's statement in order to help the jury understand the criminal nature of Blanchard's conduct. Commonwealth's Exhibit 8, reflecting the text messages, was admitted over Blanchard's objection because "aspects of it were referred to in cross-examination" and the trial court found that "in fairness the context should be allowed." Blanchard conceded that he asked Krona about her response to the allegations, but he maintained that Commonwealth's Exhibit 8 was "not relative to that portion" of the specific text messages he inquired about and suggested that the messages would only confuse the jury.

Assuming without deciding that the admission of the text messages was error, we hold that any error was harmless. A close review of the admitted text messages indicates that they mirrored R.B.'s testimony in almost exacting detail and were, therefore, merely cumulative of evidence the jury already heard. For that reason, we cannot conclude that their admission substantially affected the outcome of the case.

> When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any . . . defect, imperfection, or omission in the record, or for any error committed on the trial.

Code § 8.01-678. "[I]n order to determine whether there has been 'a fair trial on the merits' and whether 'substantial justice has been reached,'" in a criminal case, "a reviewing court must decide whether the alleged error substantially influenced the jury. If it did not, the error is harmless." *Clay*

- 15 -

*v. Commonwealth*, 262 Va. 253, 259 (2001). In other words, "[i]f, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand." *Id.* at 260 (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)).

In considering whether an error was harmless, the error must be considered "in the context of the entire case." *Montgomery v. Commonwealth*, 56 Va. App. 695, 704 (2010). Whether an error is harmless depends on numerous factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Perry v. Commonwealth*, 58 Va. App. 655, 672 (2011) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). Here, the trial court admitted a portion of the text messages R.B. sent to Krona after the August 14, 2021 kitchen incident. The text message stated:

> Not sure if you're awake or not but I need to tell someone. I know you've got a lot on your plate right now and I'm sorry for adding more but a few months ago I started staying up late at night. My dad and I would be alone downstairs in the living room. One night I asked for a massage because my shoulders were killing me. I can't remember if it was that night or not but eventually he started getting handsy. He would lift up my shirt over my chest and massage my breasts. One night asked if that was okay and I shook my head no. He followed by lowering everything back down and apologized but a few nights later he did it again. Another time I remember he took me to his and blues room and had me lay on my stomach. He unclamped my bra, which I understand as it gets in the way of my back but he then started getting close to my chest again. By then I knew what he was doing so I would move myself to where it was (what I thought) was obvious I didn't want him going there. It hadn't happened recently since I've been out of the house and avoided being in the same room as him alone especially at night. Well tonight as I was doing the dishes, he came downstairs, helped me and when he had nothing to do, he started with the massages again. He pretty much pinned me against the sink. Not with force but I couldn't get out from in front of him unless I shoved him out of the was [sic]. My back was to him and I could feel him getting hard. (Which isn't the first time) I would try and move myself to where my butt wasn't up against him but there really was no where for me to

- 16 -

go. When he does this I can't talk, I can't move, I can't get away. The only thing I can do is try and position myself to where it's what I think obvious that I am uncomfortable. As I was finishing up, I was trying to keep myself busy and fill the pepper grinder and I had to reach up in the cabinet to get the pepper corn and I could feel him push himself against me harder. I moved away from him to get a stool to get the box and it was a full on erection. I haven't told blue because how would she believe me. And I don't know how I would bring it up to my dad.

I don't have enough money to move out, and I don't have any friends to love [sic] in with. And I'm not moving in with coby and I don't wanna move out of the state, I don't know where to go or what to do.

I have to be at work at 6:30 tomorrow and I can't sleep because the situation keeps replaying in my head[.]

I have no proof he did any of this either[.]

It's gross, I feel disgusting, I feel sick.

The trial court expressly admitted the text message to explain Krona's response to this text message—inquired about on cross-examination—and not to, as Blanchard suggested, bolster R.B.'s testimony.

In any case, if the trial court erred in admitting the text message, that error was harmless in light of the other extensive evidence properly before the trial court. R.B. testified that, beginning in March 2021, Blanchard embarked on a course of conduct in which he repeatedly touched her breasts while giving her back massages. She posted a TikTok video in March 2021 stating as much after the touching started. She testified at trial about several instances of touching, which culminated in the final incident in the kitchen. Blanchard admitted to Blue that he gave R.B. back massages and that he had touched her breasts, albeit accidentally. He also admitted at trial that he was in the kitchen with R.B. on August 14, 2021, and that he had no option but to stand very close to her. R.B. sought help from Karen and moved out of the house the next day. Karen testified that R.B. appeared physically upset, puffy and teary-eyed. Furthermore, Blanchard left R.B. a voicemail and sent a text, apologizing for breaking her trust and seeking to make amends. We emphasize

- 17 -

again that, while Blanchard objected to the *details* of the text coming into evidence, he did not object to the fact of the complaint *itself* coming into evidence. Thus, the text message to Krona was almost entirely cumulative of R.B.'s trial testimony and merely emphasized R.B.'s assertion that she had had enough of Blanchard's escalating sexual advances.

In light of the considerable other evidence of Blanchard's actions, we conclude that admitting the text message had, at most, but slight effect on the jury and that substantial justice has been reached. Accordingly, any error in admitting the text message was harmless.

III.

Jury Question

Blanchard's final assignment of error touches upon the trial court's refusal to explain instructions to the jury when questioned about what they should do if they did not find intent. We do not consider Blanchard's argument because he has not preserved it for appellate review.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. Accordingly, "this Court 'will not consider an argument on appeal [that] was not presented to the trial court.'" *Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004) (alteration in original) (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998)). Moreover, appellate courts "will not consider an argument that differs from the specific argument presented to the trial court, even if it relates to the same general issue." *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc) (citing *Floyd v. Commonwealth*, 219 Va. 575, 584 (1978)). "Specificity and timeliness undergird the contemporaneous-objection rule [and] animate its highly practical purpose." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "Not just any objection will do. It must be both *specific*

and *timely* — so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)).

Here, the record shows that during deliberations, the jury sent a question to the trial court inquiring what it should do if "we agree he committed the crime but we don't see evidence of intent?" The trial court returned an answer explaining that the elements of the offense "are set forth in the jury instructions." Indeed, the jury was instructed that it must find Blanchard "with lascivious intent knowingly and intentionally sexually abused [R.B.]." It was further instructed that the term "lascivious means a state of mind that is eager for sexual indulgence, desirous of inciting lust, or of inciting sexual desire and appetite." The trial court later stated for the record that it had reviewed the jury's question *with counsel* before preparing its response and inquired if there was "anything to take up before we bring the jurors in?" Both Blanchard and the Commonwealth responded, "No, Your Honor." Moreover, the question asked by the jury, which was tendered in writing, and the trial court's written response to that question, both of which appear in the record, do not contain any stated objection to the trial court's response to the jury's query. Thus, it is clear that Blanchard did not timely object to the trial court's response to the jury's question or otherwise maintain, as he does on appeal, that the trial court should have instructed the jury "that it should find [him] not guilty, unless it finds beyond a reasonable doubt that he was guilty of 'lascivious intent' during the time alleged in the indictment." For that reason, Blanchard failed to preserve this assignment of error for review.[4] The trial court's response to the jury's question is, therefore, affirmed.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed.*

---

[4] Blanchard has not invoked the good cause and ends of justice exceptions to Rule 5A:18, and we do not consider them sua sponte. *Edwards*, 41 Va. App. at 761.