COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present: Judges Beales, O'Brien and Lorish
Argued at Lexington, Virginia


PAUL REIVENS JORDAN, II

                                                    OPINION BY
v.      Record No. 1723-23-3           JUDGE MARY GRACE O'BRIEN
                                                    APRIL 15, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FRANKLIN COUNTY
Stacey W. Moreau, Judge

James C. Martin (Martin & Martin Law Firm, on briefs), for
appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


In June 2023, a jury convicted Paul Reivens Jordan, II, of second-degree murder, in

violation of Code § 18.2-32, and concealing a dead body, in violation of Code § 18.2-323.02. The

trial court imposed a total active sentence of 35 years in prison. Jordan had been in a relationship

with the victim, Heather Hodges, who was last seen in April 2012 and declared dead in May 2023.

Her body was never found.

On appeal, Jordan asserts several assignments of error. He challenges rulings concerning

the admissibility of evidence, the grant of a jury instruction, and the sufficiency of the evidence to

sustain his convictions. For the following reasons, we affirm.

BACKGROUND

## I. Jordan's Relationship with Heather Hodges

Heather and Jordan began a relationship when she was only 12 or 13 years old; Jordan was 12 years older. For several years, while Heather was still a teenager, they lived together with Heather's older sister, Crystal. All three struggled with substance abuse.

Jordan physically abused Heather, and she often fought back. Crystal witnessed Jordan abuse Heather and observed bruises on Heather's body. Crystal once saw Jordan drag Heather out of a bar "in a jealous rage" and "slam her up against the wall." She also saw him "slam[] her against things" and "shove her several times." Crystal encouraged Heather to move away, but Heather would "always go back." Heather and Jordan had a daughter together in 2010.

Heather confided in an acquaintance, April Montgomery, about "[n]umerous occasions" of Jordan's physical abuse. Heather told Montgomery that Jordan "would throw her around" and push, punch, and stomp on her. Montgomery observed bruises on Heather's chest, sides, ribs, and back. One night in December 2010, Heather called and begged Montgomery to come get her because Jordan was "beating her up . . . while she was holding [her daughter]." As they drove away, Jordan swerved his car into their lane because he "didn't like that [Montgomery] had [Heather]." Montgomery let Heather and the child live with her for three weeks.

Heather then went to live with Crystal and their mother, Paula, in Nebraska. After Jordan "showed up" in Nebraska and promised that he would change, Heather returned with him to Virginia. Eventually, Crystal returned as well.

The domestic violence resumed about a month later. Heather and Jordan were living together with their daughter and still abusing drugs. Heather quickly spent a $175,000 inheritance she received, buying drugs, a car, and a house in Franklin County—all of which she shared with Jordan.

## II. Heather's Disappearance

Heather was last seen on April 9, 2012—an Easter Monday. About two weeks before, Heather spoke with her friend Cory Page. Heather told him that she needed to leave Jordan because "she felt like something was going to happen to her" if she stayed. Page urged her to pack and leave, and he offered to help, but Heather "was too scared" to do so.

In the days before her disappearance, Heather told several people that Jordan was abusing her. She had reunited with an old boyfriend, Chris Margerum, and they discussed going to Florida together. Although Heather wanted to leave right away, they decided to wait until Monday so that Heather could bring her daughter along. On Saturday, Heather texted Margerum[1] that Jordan had discovered that they "had been talking" and that Heather and Jordan "got into a fight." Margerum never heard from Heather again.

That weekend, Heather also saw her longtime friend, Tabitha Amos. Amos noticed that Heather was bruised and "kept holding her ribs, saying that she couldn't breathe and she didn't feel good and that [she and Jordan] had gotten into it." Amos also saw marks on Heather's neck. Heather told Amos that Jordan had strangled her. According to Amos, Jordan often told Heather that "she would never be with anybody else but with him."

Another friend, Brita Doss, picked Heather up from a house—belonging to Danny and David Guthrie—where she was staying to avoid Jordan that weekend. Jordan came to the Guthries' house, and they told him to leave because they knew Jordan and Heather were "having problems." Jordan called the police. Heather told the responding officer that she did not want to go anywhere with Jordan—information that "upset [Jordan]." He left the Guthries' house without Heather.

---

[1] The record contains no actual text messages. Instead, witnesses simply summarized what they remembered the text messages to have said.

Heather spent the night at Doss's home, and Doss saw that Heather's arms were bruised. According to Doss, Jordan called Heather multiple times that night and told Heather that she would never see her daughter again. Heather's mother Paula picked Heather up the next morning.

On Easter Sunday, Heather saw Lisa Hundley, a local shop owner. According to Hundley, Heather said that Jordan "beat the hell out of my momma Friday night and he beat me last night, but I'm trying to make it work because we have a kid together." Hundley never saw Heather again.

On Monday morning, Crystal took Heather to the home she shared with Jordan so that she could retrieve her belongings before leaving for Florida. Although they did not expect Jordan to be there, he ran outside "screaming and yelling" and was "very angry and vulgar." Jordan had been calling Crystal all weekend, angrily looking for Heather and threatening to report Crystal to police, because Crystal's license was suspended. Although Heather was crying and did not want to stay with Jordan, Crystal told her to stay because Crystal "couldn't afford to get in trouble." Crystal testified that her plan was to go to a methadone clinic while Heather packed and return later to pick Heather up at the end of the street—and they would leave together. Heather was not there when Crystal returned. Crystal called Heather, and Jordan answered her phone; Jordan said Heather was asleep. When Crystal called later that day, Jordan again answered and said he was "going to get something to make [Heather] feel better."

Jordan called Crystal that night after 10:00 p.m. He was "frantic" and said Heather was "gone." Jordan told Crystal that Heather left without taking anything—not even her purse, which she typically took everywhere. Jordan told Crystal he went to Dairy Queen to get Heather "something sweet to eat," was gone for ten minutes, and came back to find Heather gone. This time, when Crystal tried calling Heather, no one answered. The next day, Crystal contacted the sheriff's office, but deputies declined to perform a welfare check on Heather because she had not been missing long enough.

Heather had left a voicemail for Anthony Barnes—a man for whom she and Jordan had worked. Barnes did not listen to the voicemail until after he learned Heather was missing. In the voicemail (which was not played at trial, only summarized in Barnes's testimony), Heather referenced that Barnes had said she could call him for help. Barnes testified that he heard a man "hollering" in the background with "anger in his voice." Barnes had previously seen Jordan hit Heather and "put his hand around her neck."

### III. The Investigation

On Wednesday, April 11, 2012, Jordan reported Heather missing. Deputy Bryan Webb interviewed him and saw that he had a fresh scratch on his face, a mark under his eye, and scratches on his neck. Jordan acknowledged that he, Heather, and Heather's mother Paula had gotten into a fight the prior Thursday and that he was charged with assaulting Paula. But when Deputy Webb noted that the scratch did not look "that old," Jordan offered another explanation—that he had hit his head unloading a trailer the day before. Jordan admitted that he and Heather had "hurt each other before," which was why she moved to Nebraska. He further acknowledged that he "promised her" he "would never do it again," which was "why she came home."

Jordan told Deputy Webb that Heather had come home early Monday morning, when Crystal dropped her off, and slept most of the day. When she woke up at about 5:30 p.m., he got her some food, and the two of them withdrew money from the bank to buy pills. Jordan told Deputy Webb that he last saw Heather at 10:30 p.m., when he went to Dairy Queen to get her an Oreo Blizzard. When he returned, Heather was gone; Jordan believed someone had picked her up.

Jordan admitted that he had taken Heather's bank card when he left for Dairy Queen and withdrew $400, claiming it was for diapers and dog food. He denied that he and Heather physically fought on Monday and insisted that he had not "los[t] control" and accidentally hurt Heather that day. Jordan told Deputy Webb that he had not tried calling Heather, because she had lost her phone

and changed the code. Jordan also said that he had not looked for Heather but had just "stayed at home."

The police searched the area with cadaver dogs. Deputy J.P. Nolen viewed surveillance videos from the two local Dairy Queens covering the hours of 5:00 p.m. to 10:00 p.m. on the day of Heather's disappearance; both restaurants closed before 10:30, which was when Jordan claimed to have gone out. Deputy Nolen testified that he did not see Jordan or Jordan's car on either video. He also discovered that Jordan tried to purchase a $4,778.57 money order with Heather's bank card but could not complete the transaction without her PIN. Jordan told the clerk that he could not get the PIN "because [Heather] is in a mental hospital."

Jordan's friend, Brandon Williams, went to Jordan and Heather's house soon after Heather disappeared. Williams noticed that the bedroom was in disarray, although the rest of the house was relatively clean.

On May 15, 2012, investigators went to the house and found that Jordan had moved out and removed all the furniture. They collected blood samples, rolled up the bedroom carpet that was "saturated" with a red stain, and saw blood on the doorknob with a fingerprint. Forensic testing demonstrated that Heather could not be eliminated as the contributor of the DNA profile developed from blood found in the bedroom, on the doorknob, and on the furniture. Forensic testing also determined that the fingerprint in the doorknob blood belonged to Jordan.

The investigation stalled until 2017, when Investigator Holly Willoughby joined the sheriff's office. She reviewed the evidence and reinterviewed all witnesses, including Jordan. Jordan told Investigator Willoughby that on the night Heather disappeared, he went to Dairy Queen to buy pills, not Blizzards, and had lied to police about that. He denied ever beating Heather and claimed "[i]t was always [Heather] beating on [him]." He acknowledged that Heather had moved to Nebraska after an "argument" during which he merely "jerked her up and set her down on the

couch." Jordan claimed now that when Heather left on Easter Monday, she "took a couple changes of clothes." He said investigators likely found blood in his house because Heather cut her finger one night and it "looked like a damn sprinkler system going off in there." Jordan denied that any "accidental" killing occurred or that he harmed her in self-defense.

In December 2018, while incarcerated on other charges, Jordan told his cellmate that when Heather was leaving him, they got into an argument, during which Jordan "chased her" and eventually put his hands around her neck and then "couldn't wake her up." Jordan told his cellmate, "That bitch ain't coming out of that ditch."

Jordan was indicted for second-degree murder and concealing a dead body in April 2022. In May 2023, upon a petition filed by Crystal, the circuit court declared Heather dead.

IV. Pre-trial Motions

Jordan filed a motion *in limine* to exclude statements Heather made before her disappearance—specifically, statements "relat[ing] to [her] belief that [Jordan] would kill her, her fear of him[,] as well as detailing [his] past actions." Jordan argued these statements were either inadmissible hearsay or, if a hearsay exception applied, inadmissible as unfairly prejudicial. Jordan also requested an order requiring the Commonwealth to identify Heather's specific statements that it intended to offer so that he could state his objections before trial.

The Commonwealth responded that it was "still in the process of confirming whether it will be capable of offering many of these statements" but provided a non-exhaustive list of "examples of statements" that it intended to offer. The list consisted of 14 statements Heather made to unnamed witnesses about Jordan committing violence against her and threatening her life; about wanting to leave Jordan; and about her fear of Jordan in the days before her disappearance.

The court denied the motion *in limine*, generally holding that the statements were admissible as present sense impressions, excited utterances, or as evidence of Heather's state of mind. The

court also found that Heather's statements were not unfairly prejudicial. The Commonwealth waived the contemporaneous objection rule for objections to the statements addressed in Jordan's motion *in limine*—agreeing that Jordan had preserved the evidentiary issues for appeal without having to make numerous and repetitive objections at trial.

In a second motion *in limine*, Jordan sought to exclude evidence of his prior bad acts, including prior "assaultive behavior" toward Heather and her mother. Jordan argued that the Commonwealth's evidence was not probative of Jordan's identity as Heather's killer or his motive or intent to kill her and that the jury would use the prior bad acts as propensity evidence. The court denied Jordan's motion, finding that the evidence was relevant for legitimate, non-propensity purposes and its probative value outweighed any incidental prejudice.

## V. Prior Assault and Battery Charge

At trial, the parties argued about the admissibility of an arrest warrant issued on April 5, 2012, charging Jordan with assault and battery of Heather's mother. Jordan argued the warrant was inadmissible prior bad acts evidence. The Commonwealth argued that the warrant was relevant to Heather's state of mind because, prior to her disappearance, Heather had said she was not staying with Jordan at their home due to his assault of her mother. The court ruled that the warrant was relevant to show Heather's state of mind. While not waiving his objection, Jordan agreed that instead of admitting the actual arrest warrant, the following stipulation could be read to the jury: "Stipulation that Paul Jordan, II, the defendant, was charged on April 5[th], 2012, with assault and battery on Paula Hodges, with an offense date of April 5[th], 2012. It was served on Mr. Jordan on April 5[th], 2012, at 2:54 p.m."

## VI. Dairy Queen Video

During opening statements, Jordan objected to the Commonwealth's statement that an investigator went to Dairy Queen to review surveillance footage for depictions of Jordan, arguing

that the Commonwealth did not have the footage and it was "hearsay to make reference to what he saw or didn't see on a video when they don't have it." The court said, "That is not hearsay[,] and we will get into that when it's offered."

Before the Commonwealth began its case, Jordan asked the court to rule on the admissibility of any "reference to the Dairy Queen video." Jordan argued that allowing the Commonwealth to elicit testimony about what the video did not show violated the Confrontation Clause, because the videos had been destroyed and he could not "confront the evidence that is against him." The court overruled Jordan's objection.

## VII. Jury Instruction

Jordan objected to Jury Instruction 12, which provided as follows:

> THE COURT INSTRUCTS THE JURY THAT you may consider evidence that the defendant committed offenses other than the offense for which he is on trial only as evidence of the defendant's motive; as evidence of the defendant's conduct and feelings toward the victim and relations between them; as evidence of the defendant's malice; or as evidence of the absence of mistake or accident on the part of the defendant; and for no other purpose.

Jordan based his objection exclusively on the word "malice" in the instruction, arguing "putting malice in there makes it akin to a propensity instruction . . . that if he assaulted Heather Hodges, that you may infer that he had malice when whatever happened[,] happened[,]" which "comes too close to propensity evidence." The court overruled Jordan's objection, holding that malice was an element of second-degree murder and prior bad acts evidence was admissible to establish an element of the crime charged. The jury subsequently returned a guilty verdict.

## ANALYSIS

### I. Heather's Statements (Assignments of Error 1 and 3)

Jordan assigns error to the court's denial of his motion *in limine* to exclude Heather's statements "relat[ing] to [her] belief that [Jordan] would kill her, her fear of him[,] as well as

- 9 -

detailing [his] past actions." He argues that these statements were inadmissible hearsay. Additionally, Jordan contends the court erred in barring him from eliciting Heather's purported statement about a drug debt she did not intend to pay.

We review a trial court's evidentiary rulings for an abuse of discretion. *Khine v. Commonwealth*, 75 Va. App. 435, 444 (2022); *see also Campos v. Commonwealth*, 67 Va. App. 690, 702 (2017).

In denying Jordan's motion *in limine*, the court reviewed the Commonwealth's proffer of statements it intended to offer and held that they were admissible as present sense impressions, excited utterances, and/or evidence of Heather's state of mind. Based on our review of Heather's statements ultimately admitted at trial, we find that they were admissible as evidence of her state of mind and affirm the court's evidentiary decision on that basis.[2]

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Va. R. Evid. 2:801(c). "Hearsay is inadmissible unless permitted by an exception, and the party offering the evidence must

---

[2] The Commonwealth argues that Jordan failed to preserve his appellate challenge to Heather's statements admitted at trial because they were not specifically encompassed in his motion *in limine*, the court's ruling, or the Commonwealth's waiver of the contemporaneous objection rule for trial. We disagree. The statements Jordan challenges on appeal are consistent with the statements proffered during the motion *in limine*. For example, Heather's statements to April Montgomery that Jordan "would throw her around" and push, punch, and stomp on her (i.e., statements admitted at trial) are consistent with her statements proffered at the motion *in limine* that Jordan "threw her around" and "punched her." Likewise, Heather's statements to Lisa Hundley that Jordan had recently beaten her and her mother (i.e., statements admitted at trial) are consistent with her statements proffered at the motion *in limine* that "she and [Jordan] were fighting" and Jordan "had beaten her mom up." Heather's statements to Chris Margerum about planning to leave Jordan (i.e., statements admitted at trial) are consistent with her statements proffered at the motion *in limine* "that she was going to leave [Jordan]." In short, Heather's statements proffered at the motion *in limine* and admitted at trial consistently related to her fear of Jordan, her descriptions of his violence, and her desire to leave. Therefore, Jordan's continuous objection was sufficient to preserve his appellate challenge to the admissibility of this evidence.

'clearly show' that the exception applies." *Khine*, 75 Va. App. at 444-45 (quoting *Clay v. Commonwealth*, 33 Va. App. 96, 104 (2000) (en banc), *aff'd*, 262 Va. 253 (2001)).

The state-of-mind exception to the hearsay rule permits a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." Va. R. Evid. 2:803(3). "Generally, statements made by a crime victim that show the victim's state of mind are admissible as an exception to the hearsay rule, provided the statements are relevant and probative of some material issue in the case." *Khine*, 75 Va. App. at 445 (quoting *Clay v. Commonwealth*, 262 Va. 253, 257 (2001)).

> "[F]or the state of mind of the victim to be relevant to prove the state of mind of the accused, some nexus must exist which inferentially implicates the accused," such as "previous threats made by the defendant toward[] the victim, narrations of past incidents of violence on the part of the defendant[,] or general verbalizations of fear of the defendant."

*Id.* (first alteration in original) (quoting *Clay*, 33 Va. App. at 105). Additionally, in a murder prosecution, "a victim's statements regarding fear of the accused are admissible to rebut claims by the defense of self-defense . . . or accidental death." *Clay*, 262 Va. at 257.

Here, witnesses testified about Heather's descriptions of Jordan's physical abuse, threats on her life, and her desire to leave him. Heather's statements reflected her belief that Jordan would harm her and she feared him. Her state of mind was, in turn, relevant to establish Jordan's state of mind—indeed, his malicious intent in murdering her and concealing her body. Her statements helped establish that she planned to leave Jordan and he reacted violently to that plan. Heather's statements also rebutted any claims by Jordan that he did not kill her or that her disappearance was voluntary, defenses similar to the "accidental death" scenario addressed by the Supreme Court in *Clay*. *Id.* Thus, a nexus between Heather's state of mind and Jordan's state of mind existed and inferentially implicated Jordan. *See Khine*, 75 Va. App. at 445; *see also Clay*, 262 Va. at 257-58.

- 11 -

The relevance of Heather's statements, however, does not end our inquiry. Relevant evidence may be excluded if its probative value is "substantially outweighed by . . . the danger of unfair prejudice." Va. R. Evid. 2:403(a)(i). But evidence that is "highly prejudicial to a party's claim or defense, in and of itself, 'is not a proper consideration in applying the balancing test.'" *Fields v. Commonwealth*, 73 Va. App. 652, 672 (2021) (quoting *Lee v. Spoden*, 290 Va. 235, 252 (2015)). The fact that evidence is "powerful because it accurately depicts the gravity and atrociousness of the crime or the callous nature of the defendant does not thereby render it inadmissible." *Id*. at 672-73 (quoting *Powell v. Commonwealth*, 267 Va. 107, 141 (2004)). To constitute unfair prejudice, the evidence must inflame a factfinder's passion and "invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Id.* at 673 (quoting *Lee*, 290 Va. at 251). It must "generate[] such a strong *emotional* response that it is unlikely that the jury could make a *rational* evaluation of its proper evidentiary weight." *Id.* "The responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the trial court." *Spencer v. Commonwealth*, 240 Va. 78, 90 (1990).

During the motion *in limine* hearing, the court carefully considered the examples of Heather's statements that the Commonwealth intended to offer and explained that their probative value was not substantially outweighed by a danger of unfair prejudice. The statements that were ultimately admitted at trial were not materially different from those raised in the motion *in limine*. Heather told numerous people about Jordan's violent acts, threats on her life, and her desire to leave. Although these statements captured the seriousness of Jordan's behavior, nothing in the record suggests that they inflamed the jurors or compromised their rational thinking. *See Fields*, 73 Va. App. at 672-73. Indeed, Heather's statements largely corroborated testimony from witnesses who personally observed Jordan's abusive behavior. Because Jordan's intent was at issue in the

- 12 -

case, and Heather's statements were probative of this issue and not unfairly prejudicial, the court did not abuse its discretion in admitting them.

Next, Jordan argues the court erred when it precluded him from questioning Crystal about a purported statement Heather made "that she was only going to pay half of a certain debt she owed to a drug dealer in New Jersey." Jordan argues that the statement was admissible under the state-of-mind exception to the hearsay rule, reflected Heather's "plan" not to pay the drug dealer, and was relevant to show her dangerous lifestyle and that she could have been killed by a drug dealer.

The court did not abuse its discretion in excluding the statement. The state-of-mind exception under Virginia Rule of Evidence 2:803(3) only applies where the declarant's state of mind is relevant and probative of a material issue in the case. *Khine*, 75 Va. App. at 445. Heather's statement that she owed a debt to an unnamed drug dealer was not relevant to any material issue. Although Jordan argues the statement was probative as to the identity of Heather's killer, only when proffered evidence of third-party guilt "tends clearly to point to some other person as the guilty party will such proof be admitted." *Juniper v. Commonwealth*, 271 Va. 362, 412 (2006) (quoting *Elliott v. Commonwealth*, 267 Va. 396, 424 (2004), *cert. denied*, 543 U.S. 1081 (2005)). Otherwise, "[s]uch evidence is irrelevant; it tends to confuse and mislead a jury unless 'evidence [has been] introduced . . . [that] points directly to guilt of a third party.'" *Oliva v. Commonwealth*, 19 Va. App. 523, 527 (1995) (first alternation added) (quoting *Weller v. Commonwealth*, 16 Va. App. 886, 890 (1993)). Without any other evidence, the mere statement that Heather planned to pay only half of a drug debt was inadmissible to establish third-party guilt and not relevant to any other material issue. Therefore, the court did not err in precluding the statement.

## II. Prior Bad Acts (Assignments of Error 2 and 6)

Jordan argues the court erred by denying his motion *in limine* to exclude evidence of his prior bad acts. According to Jordan, the inadmissible "bad act evidence" came from several witnesses testifying about the domestic violence they personally observed over at least a two-year period, including that he dragged Heather from a bar in a jealous rage, slammed her on the ground, shoved her, beat her while she was holding their child, inflicted bruises, and strangled her. He also argues the court erred by allowing evidence that he was charged with assault and battery of Heather's mother on April 5, 2012—the Thursday before Heather disappeared.

Evidence "'tend[ing] to show that the accused is guilty of other crimes and offenses at other times' is not admissible if 'offered merely to show [the accused's] propensity to commit' the charged crime." *Harvey v. Commonwealth*, 76 Va. App. 436, 475 (2023) (alterations in original) (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 714-15 (2008)); *see* Va. R. Evid. 2:404(b). "However, numerous exceptions to this rule authorize the admission of [prior] 'bad acts' evidence." *Harvey*, 76 Va. App. at 475 (alteration in original) (quoting *Ortiz*, 276 Va. at 714). Such evidence may be admitted to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or . . . common scheme or plan." Va. R. Evid. 2:404(b); *see also Kirkpatrick v. Commonwealth*, 211 Va. 269, 272 (1970) ("Evidence of other offenses is admitted if it shows the conduct and feeling of the accused toward his victim, if it establishes their prior relations, or if it tends to prove any element of the offense charged."). Virginia follows an "inclusionary approach" by "admitting [other-crimes] evidence 'if relevant[] for any purpose *other than* to show a mere propensity.'" *Harvey*, 76 Va. App. at 476 (alterations in original) (quoting *Castillo v. Commonwealth*, 70 Va. App. 394, 415 (2019)).

This evidence is only admissible if its "legitimate probative value . . . outweigh[s] its incidental prejudice." *Kenner v. Commonwealth*, 299 Va. 414, 427 (2001) (quoting Va. R. Evid.

2:404(b)). However, "[t]he fact that some prejudice may result does not justify automatic exclusion." *Mayfield v. Commonwealth*, 59 Va. App. 839, 849 (2012) (quoting *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 196 (1987)). "Indeed, '[a]ll evidence tending to prove guilt is prejudicial to an accused.'" *Id.* (alteration in original) (quoting *Powell*, 267 Va. at 141). "[W]here a course of criminal conduct . . . consist[s] of a series of related crimes, the perpetrator has no right to have the evidence 'sanitized' so as to deny the jury knowledge of all but the immediate crime for which he is on trial." *Kenner*, 299 Va. at 426-27 (quoting *Scott v. Commonwealth*, 228 Va. 519, 526 (1984)). "Virginia law . . . intervenes only when the alleged prejudice tends to inflame irrational emotions or leads to illegitimate inferences. And even then, [the issue is] a matter of degree." *Thomas v. Commonwealth*, 44 Va. App. 471, 758, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005). The responsibility for balancing probative versus prejudicial value "rests with the sound discretion of the trial court." *Harvey*, 76 Va. App. at 479; *see* Va. R. Evid. 2:404(b).

Here, the Commonwealth had to prove that Heather was in fact dead and Jordan maliciously killed her. Accordingly, evidence of Jordan's prior physical abuse toward Heather was relevant to establish the parties' relationship and was probative of the element of malice. *See Burnette v. Commonwealth*, 60 Va. App. 462, 480 (2012) (holding that evidence of prior bruising on a child— considered alongside the defendant's inconsistent explanations—was admissible in a child abuse trial because it demonstrated the defendant's prior relationship with and feelings toward the child).

Moreover, the court did not abuse its discretion in finding that the legitimate probative value of this relevant evidence outweighed the incidental prejudice. Jordan was not entitled to have his abusive history "sanitized" from the record so as to "deny the jury knowledge of all but the immediate crime[s]" for which he was on trial. *Kenner*, 299 Va. at 426-27 (quoting *Scott*, 228 Va.

- 15 -

at 526). The court instructed the jury on multiple occasions—both during trial[3] and before deliberations—that it could not consider Jordan's prior bad acts as evidence that he killed Heather, but only to show his state of mind and the nature of their relationship.

The evidence demonstrated that Jordan and Heather were in a tumultuous relationship characterized by physical abuse, and the challenged evidence was admissible to establish the full context of their relationship to prove that Jordan intentionally killed Heather and disposed of her body. The evidence was, of course, prejudicial. But the court did not abuse its discretion in finding that the legitimate probative value outweighed the incidental prejudice.

III. Testimony Regarding Dairy Queen Videos (Assignment of Error 5)

Jordan argues the court erred in allowing "references to evidence from [the] destroyed [Dairy Queen] videos, in violation of the Confrontation Clause of the Sixth Amendment." He argues that the Confrontation Clause "mandate[s] a witness who can be cross-examined, but the destruction of this evidence has precluded that." He further contends that the videos were "potentially exculpatory," yet the court allowed Deputy Nolen's recollection of what he saw to rebut Jordan's claim that he was at Dairy Queen when Heather disappeared.[4]

The Confrontation Clause "mandates that 'in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Wimbish v. Commonwealth*, 51 Va. App. 474, 480 (2008) (alteration in original) (quoting U.S. Const. amend. VI). The constitutional right of confrontation applies only to testimonial hearsay. *See Crawford v.*

---

[3] After Anthony Barnes testified about witnessing Jordan hit and strangle Heather, the court instructed the jury that it could consider "testimony that [Jordan] previously assaulted [Heather] only for the purpose of showing the conduct and attitude of [Jordan] towards [Heather], the nature of their relationship" and not as "evidence that [Jordan] committed the murder for which he is on trial."

[4] Jordan has never argued, nor does the record reflect, that the Commonwealth failed to disclose evidence in violation of *Brady v. Maryland*, 273 U.S. 83 (1963).

*Washington*, 541 U.S. 36, 68-69 (2004). If evidence is testimonial hearsay, it is "inadmissible unless the [declarant] is unavailable and the defendant had a prior opportunity for cross-examination." *Adjei v. Commonwealth*, 63 Va. App. 727, 744 (2014). For evidence to be "inadmissible on Confrontation Clause grounds, it must be both (1) hearsay; and (2) testimonial in nature." *Bennett v. Commonwealth*, 69 Va. App. 475, 486 (2018).

To constitute hearsay, there must be a verbal or nonverbal assertion of fact. Va. R. Evid. 2:801(a). "[W]here 'there is no out-of-court asserter,' there can be no hearsay." *Bynum v. Commonwealth*, 57 Va. App. 487, 491 (2011) (quoting *Tatum v. Commonwealth*, 17 Va. App. 585, 588 (1994)). "Hearsay statements are testimonial if they 'are the "sort [that] cause the declarant to be a 'witness' within the meaning of the Confrontation Clause."'" *Bennett*, 69 Va. App. at 486 (alteration in original) (quoting *Aguilar v. Commonwealth*, 280 Va. 322, 330 (2010)).

Here, the challenged evidence is Deputy Nolen's summary of what he saw in the Dairy Queen videos. Specifically, he recounted that Jordan did not appear at a Dairy Queen as he had claimed. The videos were neither hearsay nor testimonial. *See Bennett*, 69 Va. App. at 488 (holding that "unless the video contains conduct that 'is intended [by the actor] as an assertion,' the contents of the video simply are not hearsay" (alteration in original) (quoting Va. R. Evid. 2:801(a))); *Baez v. Commonwealth*, 79 Va. App. 90, 110 (2023) ("[T]he video *itself* cannot be testimonial."). Deputy Nolen did not testify to any statements made by a declarant in the videos but merely described what he personally observed. Jordan had no constitutional right to confront the videos themselves, and he "substantially and fairly exercised" his Confrontation Clause rights when cross-examining Deputy Nolen about what he observed in the videos and how they were not preserved. *See Moore v. Commonwealth*, 202 Va. 667, 669 (1961) (stating that once "the right of cross-examination has been substantially and fairly exercised," the "allowance of further cross-

examination becomes discretionary with the court"). Accordingly, the court did not err in allowing Deputy Nolen to testify about the content of the Dairy Queen surveillance videos.

### IV. Jury Instruction (Assignment of Error 7)

Jordan argues the court erred by instructing the jury that it could consider evidence of his other offenses for purposes of determining malice.

An appellate court's "responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). On appeal, a trial court's decision to give or deny requested jury instructions is reviewed for an abuse of discretion. *Davis v. Commonwealth*, 79 Va. App. 123, 152 (2023). The legal correctness of the jury instructions is reviewed de novo. *Watson v. Commonwealth*, 298 Va. 197, 207 (2019). A jury instruction is proper when, "view[ed] in the light most favorable to the proponent of the instruction," "more than a scintilla of evidence" supports the instruction. *Id.* (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).

Jordan argues that Jury Instruction 12 "allowed the malice of murder to be improperly inferred from [his] prior assault and battery charge." Jury Instruction 12, based on Instruction No. 2.260 of the Virginia Criminal Model Jury Instructions, was an accurate statement of the law and supported by the evidence. Evidence of Jordan and Heather's relationship and his physical abuse was properly admitted because it was probative of the element of malice, as well as to demonstrate Jordan's "conduct and feeling[s]" toward Heather and that her death was not accidental. *Kirkpatrick*, 211 Va. at 272. Jury Instruction 12 also explained that such evidence was not propensity evidence. *See Harvey*, 76 Va. App. at 480 (noting that trial court "limited the impact of the other-crimes evidence through a cautionary instruction directing the jury to consider the

- 18 -

evidence for the limited purposes of his intent, identity, and modus operandi"). Accordingly, the court did not err in including the word "malice" in Jury Instruction 12.

### V. Sufficiency of the Evidence (Assignment of Error 4)

Jordan argues the evidence was insufficient to convict him of second-degree murder and concealing a dead body.

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Melick v. Commonwealth*, 69 Va. App. 122, 144 (2018) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)).

"Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). "A circumstantial fact is admitted on the basis of an inference when the inference is a probable explanation of another fact and a more probable and natural one than other explanations, if any." *Commonwealth v. Barney*, 302 Va. 84, 98 (2023) (quoting *Toler v. Commonwealth*, 188 Va. 774, 780 (1949)).

Second-degree murder under Code § 18.2-32 "is defined as a malicious killing." *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016). "In order for an act to be done maliciously, the act must be done 'wil[l]fully or purposefully.'" *Id.* (quoting *Essex v. Commonwealth*, 228 Va. 273, 280 (1984)). "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation." *Id.* (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992)). Further, we note that a murder conviction does not require evidence of a dead body. *Edwards v. Commonwealth*, 68 Va. App. 284, 298 (2017) (affirming murder conviction without evidence of a dead body where "the Commonwealth presented substantial and probative circumstantial evidence . . . that appellant had motive and opportunity to murder and that he carried out the murder").

A conviction for concealing a dead body under Code § 18.2-323.02 also requires an element of malice. The statute prohibits transporting, secreting, concealing, or altering a dead body "with malicious intent and to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death." Code § 18.2-323.02; *see Shaw v. Commonwealth*, 79 Va. App. 485, 508-09 (2024) ("Malicious intent [is] a critical element of the offense" and requires proof that the defendant concealed the body "intentionally, or without just cause or excuse, or as a result of ill will" (quoting *Bell v. Commonwealth*, 11 Va. App. 530, 533 (1991))). "Whether malice existed is a question for the jury." *Branch*, 14 Va. App. at 841.

The evidence, when viewed in the light most favorable to the Commonwealth (because the Commonwealth was the party that prevailed below in the trial court), was sufficient to prove that Jordan maliciously killed Heather after learning she was going to leave him and disposed of her body to conceal the crime. Jordan and Heather had been in a tumultuous relationship in which Jordan abused her. Heather had previously moved to Nebraska with her mother and sister but

- 20 -

returned to Virginia with Jordan after he promised to change his behavior. Jordan acknowledged to Deputy Webb that Heather had gone to Nebraska to extricate herself from the abusive relationship and that he promised he "would never do it again" and "that's why she came home."

The abuse resumed after Heather returned from Nebraska. Heather reunited with Chris Margerum, whom she had previously dated, and the couple planned to leave the day after Easter to move to Florida with Heather's daughter. On Saturday, Heather texted Margerum that Jordan found out they had been talking and that Heather and Jordan fought. Margerum never heard from Heather again. A jury could infer that Jordan's discovery of the plan motivated him to kill Heather.

Multiple witnesses saw Heather the weekend before her disappearance, observed injuries that Jordan had inflicted, and witnessed his anger when he unsuccessfully tried to convince Heather to return home.

The day before her disappearance, Heather told Lisa Hundley that she was trying to make her relationship with Jordan work for the sake of their daughter, but that Jordan had recently beaten both her and her mother.

The morning of Heather's disappearance, Crystal dropped her off at the home she and Jordan shared so that Heather could retrieve her belongings and prepare to leave Jordan. They did not expect Jordan to be home, but he was there—agitated and "very angry and vulgar." That day, Heather also left a voicemail with Anthony Barnes, asking for help; in the background, Barnes could hear a man yelling.

When Jordan went to the sheriff's office to report Heather missing, he had a fresh scratch on his face and admitted that he had not actually looked for Heather that day. A jury could infer that Jordan sustained the scratch when he killed Heather and that he had not searched for her because he knew she was dead.

Further, Jordan unsuccessfully attempted to use Heather's bank card to obtain a nearly $5000 money order from her account. He told the clerk that he could not get Heather's PIN "because she [was] in a mental hospital," which was a lie. This conduct further supports the jury's conclusion that Jordan maliciously killed Heather and disposed of her body to conceal the crime.

Jordan's friend, Brandon Williams, testified that when he went over to the house Heather and Jordan shared soon after Heather disappeared, he saw that the bedroom was in disarray. A later forensic analysis could not eliminate Heather as a contributor to a DNA profile developed from blood found during the police investigation; from this analysis, a jury could reasonably infer that Heather's blood was all over the bedroom, its walls, and furniture. Jordan's fingerprint was found in Heather's blood on the doorknob.

Jordan told his cellmate that, when Heather said she was leaving him, they argued and he "chased her," put his arms around her neck, and then "couldn't wake her up." Jordan also told his cellmate, "That bitch ain't coming out of that ditch." From this evidence, a jury could reasonably conclude that Jordan acted with malice in killing Heather and concealing her body.

Jordan claims that his hypotheses of innocence created reasonable doubt as to second-degree murder. He speculates that Heather was "killed non-maliciously or accidentally," perhaps as a result of taking drugs or in response to her provocation. However, "[t]he issue upon appellate review is not whether 'there is some evidence to support' these hypotheses." *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003). "The issue is whether a reasonable jury, upon consideration of all the evidence could have rejected [Jordan's] theories in his defense and found him guilty of [second-degree] murder beyond a reasonable doubt." *Id.* The evidence here reasonably allowed the jury to reject his defense theories. Jordan maintained that he did not know where Heather was, not that her death was accidental, in self-defense, or in response to provocation. He always said that she vanished while he was out at Dairy Queen. And even that story shifted over time: first, he claimed

he went out to buy her ice cream; later he said he went out to buy drugs. The jury was entitled to disregard these self-serving and conflicting statements and infer that Jordan was lying to conceal his guilt. *See Washington v. Commonwealth*, 75 Va. App. 606, 616 (2022) ("[T]he fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that [he] is lying to conceal his guilt." (quoting *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011))).

For the body-concealment charge, Jordan speculates that Heather's body "decomposed in some open but inaccessible rural field or stream." Again, there is evidence in the record to contradict this hypothesis and lead a reasonable jury to reject it. Specifically, forensic evidence supports a finding that Jordan killed Heather in their bedroom, attempted to clean up her blood, and disposed of her body to conceal the crime. *See* Code § 18.2-323.02. This evidence, although circumstantial, was sufficient to sustain Jordan's conviction for concealing a dead body. *See id.*

Based on the record before us, we cannot say that the jury's verdict was plainly wrong or without supporting evidence.

CONCLUSION

For these reasons, we affirm Jordan's convictions for second-degree murder and concealment of a dead body.

*Affirmed*.